# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-3141

_____

| | | |
|---|---|---|
| State of Minnesota, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Kenneth S. Apfel, Commissioner of | * | District of Minnesota. |
| Social Security; Social Security | * | |
| Administration, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted:  March 12, 1998

Filed:  July 6, 1998

_____

Before WOLLMAN and HANSEN, Circuit Judges, and GOLDBERG,[1] Judge.

_____

WOLLMAN, Circuit Judge.

This case involves an assessment issued by the Commissioner of Social Security against the State of Minnesota for unpaid social security contributions attributable to stipends paid to medical residents enrolled in the graduate medical education program at the University of Minnesota during 1985 and 1986.  Following the issuance of the

_____

[1]The HONORABLE RICHARD W. GOLDBERG, Judge, United States Court of International Trade, sitting by designation.

assessment, the State initiated an action seeking a redetermination of liability. The district court[2] granted summary judgment in favor of the State. We affirm.

## I.

The inception of the social security system can be traced to the adoption of the Social Security Act of 1935, 49 Stat. 620, as amended, 42 U.S.C. § 301 et seq. (1982 & Supp. II 1984).[3] At that time, there was some question as to whether it would be constitutionally permissible for Congress to compel the states and their political subdivisions to participate in the system. For this reason, the Act initially excluded state employees from the scope of its coverage. See 42 U.S.C. § 410(a)(7). In 1950, however, Congress enacted section 418, which allows states and their political subdivisions to voluntarily participate in the system by executing an agreement with the Commissioner. See 42 U.S.C. § 418(a)(1).[4] If a state enters into a section 418 agreement, covered employees and their employing agencies become subject to the payment of social security contributions and, in return, the employees earn credit toward social security old age and disability benefits.

To a certain extent, states have the ability to define the contours of their section 418 agreements. For example, states may designate particular groups of employees for coverage. However, the provisions of the agreement may not be "inconsistent with the provisions of" section 418. See 42 U.S.C. § 418(a)(1). In addition, section 418

---

[2]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

[3]In order to reflect the Act as it existed during the years 1985 and 1986, all statutory references are to the 1982 United States Code.

[4]Under section 418, agreements were initially executed between the states and the Department of Health, Education, and Welfare. This department was subsequently supplanted by the Department of Health and Human Services, which was in turn succeeded by the Social Security Administration.

provides for certain coverage exclusions, some of which are mandatory and some of which are optional. Among the optional exclusions is an exclusion for "any agricultural labor, or service performed by a student, designated by the State." See 42 U.S.C. § 418(c)(5). Section 418 also provides that agreements may be modified at any time to extend coverage to additional groups of state employees. See 42 U.S.C. § 418(c)(4).

Minnesota executed a section 418 agreement in 1955. See Administrative Record (A.R.) at 1. Initially, this agreement applied to only a few limited coverage groups. Shortly following the initial agreement, a number of subsequent modifications were executed in order to extend coverage to various other groups. In 1958, the State executed a modification adding "[s]ervices performed by individuals as employees" of the University of Minnesota "as an additional coverage group." A.R. at 13. This modification listed several exclusions, one of which, consistent with section 418(c)(5), excluded "[a]ny service performed by a student." A.R. at 13.

For more than thirty years after execution of the 1958 modification, the University did not withhold social security contributions from stipends paid to medical residents at its teaching hospital; nor did it pay the employer's share of contributions. This practice was consistent with the University's belief that medical residents were not included in the coverage group identified by the 1958 modification. In 1989, the Social Security Administration (SSA) initiated an investigation of the treatment of medical residents under the State's section 418 agreement. On September 13, 1990, the SSA issued a formal notice of statutory assessment asserting that the State was liable for unpaid social security contributions totaling nearly $8 million and that such contributions were attributable to stipends paid to medical residents during the years 1985 and 1986. The State sought review of this assessment on administrative appeal, and the assessment was affirmed without modification on December 8, 1993.

The State then filed a civil action in district court pursuant to 42 U.S.C. § 418(t),[5] seeking a redetermination of the assessment. Both the State and the Commissioner filed motions for summary judgment. In addition, each party stipulated that the correct amount of the assessment, if valid, was approximately $4.7 million.[6] The district court granted the State's motion for summary judgment and overturned the assessment. In doing so, the court relied upon alternative grounds. First, it held that the medical residents were not "employees" of the University within the meaning of the 1958 modification. Second, it concluded that, even if the residents were employees under the terms of the modification, they were excluded from coverage under the modification's student exclusion. The Commissioner now appeals.

## II.

We review a grant of summary judgment *de novo*, applying the same standard as that employed by the district court. See Rose-Maston v. NME Hospitals, Inc., 133 F.3d 1104, 1107 (8th Cir. 1998). Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates the absence of any genuine issue of material fact so that the moving party is entitled to judgment as a matter of law. See id.; Fed.R.Civ.P. 56(c).

Generally, an administrative agency has considerable discretion in carrying out the mandates of statutes it is entrusted to administer. See Mausolf v. Babbitt, 125 F.3d 661, 667 (8th Cir. 1997), cert. denied, 66 U.S.L.W. 3604 (U.S. June 26, 1998) (No. 97-1443). We must defer to the agency's decision so long as it "is not 'arbitrary,

---

[5]This section was repealed in 1986, see P.L. 99-509, § 9002(c)(1). It permitted states to seek judicial review of an SSA assessment by filing "a civil action for a redetermination of the correctness of the assessment of the amount due."

[6]Apparently, the original assessment of nearly $8 million was based on estimated information rather than the University's payroll records.

-4-

capricious, an abuse of discretion, or otherwise not supported by law.'"   Reder v. Administrator of Fed. Aviation Admin., 116 F.3d 1261, 1263 (8th Cir. 1997) (quoting Trans-Allied Audit Co., Inc. v. Interstate Commerce Comm'n, 33 F.3d 1024, 1030 (8th Cir. 1994)).

The State, noting that section 418(t) provided for a "redetermination" of the assessment, urges us to disregard this deferential standard in favor of a more probing review.  Whatever the merits of this argument, we conclude that the Commissioner's decision to uphold the assessment finds no support in law or fact and consequently fails to survive even the most deferential standard of review.

## A.

The first of the district court's alternative holdings was that the residents were not "employees" of the University as that term is used in the 1958 modification.  The court reasoned that the 1958 modification was a contract and that its terms must be interpreted by giving effect to the intent of the parties.  The court further concluded that uncontroverted evidence demonstrated that when the parties executed the modification, they did not intend to extend coverage to the medical residents[7] and that this intent was

---

[7]This determination is supported by a number of factors.  First, the 1958 modification expressly stated that it was intended to cover 225 employees.  In the fall of 1958, there were 422 medical residents enrolled at the University of Minnesota.  Second, minutes from a meeting of the Board of Regents indicate that the modification was intended to cover certain faculty positions only.  Third, an Internal Revenue Service Ruling issued prior to the modification indicated that stipends paid to medical residents were excluded from wages because such stipends were paid primarily to further the residents' education and training.  See Rev. Rul. 57-560 (1957).  Finally, the University had consistently treated the residents' stipends as excluded from coverage for more than thirty years.

controlling regardless of post-1958 case law holding that medical residents are employees.[8]

The Commissioner does not seriously dispute the district court's conclusion that the parties did not contemplate extending coverage to residents when they executed the 1958 modification. Rather, he contends that the modification is not contractual in nature and that the parties' intent in 1958 is irrelevant. In support of this proposition, the Commissioner relies on the Supreme Court's decision in <u>Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment</u>, 477 U.S. 41 (1986). <u>Bowen</u> involved a section 418 agreement executed in 1951 by the State of California. <u>See id.</u> at 48. The agreement contained a provision, authorized by section 418(g), permitting California to terminate its section 418 agreement by giving at least two years' written notice. <u>See id.</u> at 48-49. In 1983, however, Congress amended section 418(g) to prohibit states from terminating section 418 agreements "on or after April 20, 1983." 42 U.S.C. § 418(g). That amendment prevented states from withdrawing from the system even if a termination notice had already been filed. <u>See Bowen</u>, 477 U.S. at 48. At the time of the amendment, California had filed termination notices for a number of its employees. <u>See id.</u> at 49. When the amendment prevented these notices from taking effect, the state initiated proceedings to challenge the validity of the amendment. <u>See id.</u> California argued that the right to terminate coverage for its employees was a contractual right and that the amendment deprived them of this right without just compensation in violation of the Fifth Amendment. <u>See id.</u>

The Supreme Court rejected this argument, concluding that amended section 418(g) did not constitute a taking of property within the meaning of the Fifth

---

[8]For example, since 1958, various courts have concluded that, for federal income tax purposes, medical residents are considered employees. <u>See, e.g.</u>, <u>Rockswold v. United States</u>, 620 F.2d 166, 169 (8th Cir. 1980); <u>Parr v. United States</u>, 469 F.2d 1156, 1158 (5th Cir. 1972); <u>Hembree v. United States</u>, 464 F.2d 1262, 1264 (4th Cir. 1972).

Amendment.  See id. at 55-56.  The Court first noted that in enacting the Social Security Act, Congress had anticipated the need to be flexible in responding to changing social and economic conditions.  See id. at 51-52.  For this reason, Congress expressly included a provision reserving "[t]he right to alter, amend, or repeal any provision of" the Act.  Id. 42 U.S.C. § 1304.  In light of this express reservation of authority, the Court stated that "courts should be extremely reluctant to construe § 418 Agreements in a manner that forecloses Congress' exercise of that authority."  Id. at 52.

The Court concluded that because Congress had expressly reserved the power to amend section 418, it also retained concurrent power to affect the terms of agreements entered into pursuant to that section.  See id. at 53-54.  As the Court explained, "The State accepted the Agreement under an Act that contained the language of reservation.  That language expressly notified the State that Congress retained the power to amend the law under which the Agreement was executed and by amending that law to alter the Agreement itself."  Id. at 54.

The Court further held that any "contractual right" created by the agreement's termination clause did not rise to the level of "property" under the Fifth Amendment.  See id. at 55.  The Court explained that the agreement's termination clause "simply cannot be viewed as conferring any sort of 'vested right' in the face of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing the language of reservation."  Id. at 55.  Thus, the Court held that amended section 418(g) was not an unconstitutional appropriation of property under the Fifth Amendment.  See id. at 55-56.

Relying on Bowen, the Commissioner argues that section 418 agreements are not contracts at all but are instead merely written evidence that a state has exercised its statutory option to participate in the social security program.  We reject this interpretation.  Although Bowen holds that section 418 agreements are subject to

modification by Congress, it does not broadly dismiss such agreements as non-contractual. To the contrary, the Court's decision is replete with references to "contractual arrangements." Indeed, the backdrop against which the Court examined California's assertions was that "contracts should be construed, if possible, to avoid foreclosing exercise of sovereign authority." Id. at 52-53. Thus, far from holding that section 418 agreements are non-contractual, the Court in Bowen actually assumed that such agreements are contracts. This assumption is further supported by section 120 of the Commissioner's Handbook for State Social Security Administrators, which recognizes that "[e]ach modification, like the original agreement, is a Federal-State contract."

The Commissioner argues that because Bowen concluded that California's section 418 agreement did not confer a Fifth Amendment property interest, the underlying agreement cannot be considered a contract. This argument distorts the Court's analysis, which merely recognized that some contractual rights are not necessarily property interests within the meaning of the Fifth Amendment. In particular, contractual terms subject to modification by Congress do not rise to the level of a Fifth Amendment property interest. See Bowen, 477 U.S. at 51-52; Education Assistance Corp. v. Cavazos, 902 F.2d 617, 628 (8th Cir. 1990) ("Whether a contractual right against the United States constitutes a vested property right for fifth amendment purposes depends on whether Congress reserved power to alter the terms of the contract"). It does not follow that such terms are not contractual in nature.

Nevertheless, the Commissioner insists that the definition of "employer" has been construed since 1958 to include medical residents and that this definition should control regardless of the parties' original intent and understanding. As the district court pointed out, however, the meaning of section 418 agreements cannot be altered "through ruling by the the [sic] SSA or through subsequent case law developments regarding the employment status of medical residents." Memorandum Opinion & Order at 12. The power to alter the terms of section 418 agreements lies exclusively

with Congress. Because Congress has not chosen to alter or amend the meaning of the State's 1958 modification, the parties' intent is controlling. See Enos v. Key Pharmaceuticals, Inc., 106 F.3d 838, 839 (8th Cir. 1997); Frank B. Hall & Co., Inc. v. Alexander & Alexander, Inc., 974 F.2d 1020, 1023 (8th Cir. 1992). Accordingly, we agree with the district court that the residents were not employees of the University under the terms of the 1958 contract.

## B.

The district court held, alternatively, that even if medical residents were considered "employees" under the terms of the 1958 modification, the residents are excluded from coverage under the agreement's student exclusion. As noted above, the student exclusion is authorized by section 418(c)(5), which provides that "[s]uch agreement shall, if the State requests it, exclude (in the case of any coverage group) any agricultural labor, or service performed by a student, designated by the State." 42 U.S.C. § 418(c)(5). Section 418(c)(5) also cross-references the Act's general student exclusion, section 410(a)(10), which applies to service performed in the employ of a school, college, or university "if such service is performed by a student who is enrolled and regularly attending classes at such school, college, or university." 42 U.S.C. § 418(a)(10).

In arguing that the residents do not qualify for the student exclusion, the Commissioner relies principally upon Rockswold v. United States, 620 F.2d 166 (8th Cir. 1980). In Rockswold, we concluded that stipends paid to residents at the University of Minnesota's teaching hospital constituted payment for services rather than scholarships or fellowship grants and that such stipends were therefore not excludable from the residents' gross income for income tax purposes. See id. at 169. Our focus was on the nature of the stipends paid to the residents; thus, the "threshold question" was "whether the payment was made as quid pro quo for the services rendered." Id. Because we found that the payments were intended to compensate

residents for services they rendered, we concluded that the payments were not scholarships or fellowship grants.  See id.

In the present case, however, we focus not on the nature of the payments made to the residents but on the nature of the residents' relationship with the University.  The regulation implementing the student exclusion provides:  "Whether you are a student for purposes of this section depends on your relationship with your employer.  If your main purpose is pursuing a course of study rather than earning a livelihood, we consider you to be a student and your work is not considered employment."  See 20 C.F.R. § 404.1028(c).  Thus, if the residents' participation in the University's residency program is primarily educational, the residents should be considered students.  If their purpose is to earn a living, however, they do not fit within the definition of the student exclusion.

The fact that payments received by the residents constitute taxable income does not mean that the primary purpose of their relationship with the University is not educational.  We recognized as much in Rockswold, despite our ultimate conclusion that the stipends paid to the residents represented a *quid pro quo* for services rendered.  Specifically, we noted that the University's residency program "is designed to educate and train physicians so that they can pursue careers in academic medicine and medical research."  Id. at 167; see also Parr, 469 F.2d at 1157 (although teaching hospital was "operated primarily for the purpose of training doctors," payments made to residents were primarily compensatory); Hembree, 464 F.2d at 1264 (although primary purpose of teaching hospital was training of physicians rather than treatment of patients, payments made to residents were primarily compensatory).  The Commissioner acknowledges this distinction, but maintains that in this case there is no logical reason to distinguish between the purpose of the payments and the purpose of the relationship because the purpose of each is the same.  The undisputed facts make it clear, however, that the primary purpose for the residents' participation in the program is to pursue a course of study rather than to earn a livelihood.  See 20 C.F.R. § 404.1028(c).  The

residents are enrolled at the University, pay tuition, and are registered for approximately fifteen credit hours per semester.  Although they provide patient services while working at the hospital, it does not follow that they are enrolled primarily to earn a livelihood.[9]

Finally, the Commissioner urges us to defer to Social Security Ruling 78-3,  which states that "the Social Security Administration has always held that resident physicians are not students."  SSR 78-3.  Social Security Rulings, although entitled to deference, are not binding or conclusive.  Newton v Chater, 92 F.3d 688, 693 (8th Cir. 1996).  Such rulings "have neither the force nor effect of law or Congressionally promulgated regulations."  See id.  Thus, we will not defer to rulings that are "plainly erroneous or inconsistent with the Act or regulations."  Chavez v. Department of Health & Human Serv., 103 F.3d 849, 851 (9th Cir. 1996).  The bright-line rule of SSR 78-3 is inconsistent with the approach set forth at 20 C.F.R. § 404.1028(c), which contemplates a case-by-case examination to determine if an individual's relationship with a school is primarily for educational purposes or primarily to earn a living.  The Commissioner cannot avoid such a case-by-case examination by summarily concluding that medical residents are never students regardless of the nature of their relationship with their employer.

The judgment is affirmed.

---

[9]The Commissioner contends that the stipends, which ranged from $20,000 to $28,000 per year, constituted "an amount far above what one would ordinarily think of as a scholarship."  Appellant's Brief at 30.  This argument misstates the issue.  The question is not whether stipends paid to the residents were scholarships -- indeed, the State concedes that they were not.  Rather, the question is whether the residents were students within the meaning of the student exclusion.  This question depends not on the nature of the stipends but on the nature of the residents' relationship with the University.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.