David L. SOKOL, Plaintiff,

v.

Roger G. KENNEDY, in his official capacity as Director of the National Park Service; Bruce Babbitt, in his official capacity as Secretary of the United States Department of the Interior; and the United States of America, Defendants.

No. 8:97CV51.

United States District Court,
D. Nebraska.

Feb. 22, 1999.

Bartholomew L. McLeay, Michael J. Mills, Kutak, Rock Law Firm, Omaha, NE, for plaintiffs.

Sally R. Johnson, Assistant United States Attorney, Omaha, NE, for defendants.

## MEMORANDUM AND ORDER

BATAILLON, District Judge.

Before me are the parties' cross-motions for summary judgment (Filing Nos. 47 [defendants] and 49 [plaintiff]). The plaintiff claims jurisdiction for this action under 28 U.S.C. §§ 1331 and 1346(b). The plaintiff's amended complaint (Filing No. 52) seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that the National Park Service 1) failed adequately to consider a bank-to-bank boundary alternative for the Niobrara Scenic River, and 2) failed to use the "outstandingly remarkable" standard of review when determining whether land adjacent to or in the immediate environment of the Niobrara Scenic River is eligible for inclusion in the National Wild and Scenic River System. The plaintiff claims that these alleged failures represent violations of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4370d (NEPA), leading the plaintiff to seek declaratory and injunctive relief under the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 706(A) and (D)(APA). I have carefully reviewed the record, the parties' briefs and extensive indexes of evidence, and the applicable law. I find that the defendants' motion for summary judgment should be granted and the plaintiff's motion for summary judgment should be denied.

### I. Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter; rather, the court must determine whether a genuine issue exists for trial. The Eighth Circuit has recognized that primarily legal issues are amenable to summary disposition. *See, e.g., Mansker v. TMG Life Ins. Co.,* 54 F.3d 1322, 1326 (8th Cir.1995). Therefore, because the issues presented for resolution are essentially legal in nature, summary disposition of this case is appropriate.

### II. Background

The basic facts in this case can be found in a prior memorandum and order (Filing No. 46 at 2–6) in which I granted partial

summary judgment to the plaintiff on the issues of subject matter jurisdiction and standing. In brief, the plaintiff bought a ranch in Cherry County, Nebraska, on the Niobrara River in 1991, five months after Congress designated the Niobrara River a component of the Wild and Scenic River System. In this action, he asks me to set aside the Record of Decision of the National Park Service (NPS) in which the NPS established the boundaries of the Niobrara River as a national scenic river under the Wild and Scenic Rivers Act (WSRA), 16 U.S.C. §§ 1271—1287. The parties' briefs and evidence, particularly the Administrative Record submitted as part of the defendants' index of evidence, set out the following framework for the dispute.

With the WSRA, Congress protects designated "free-flowing" streams and the "related adjacent land area that possesses one or more of the values referred to in section 1271." 16 U.S.C. § 1273(b). Section 1271 provides that

> certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values shall be preserved in free-flowing condition, and ... they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations.

16 U.S.C. § 1271. In 1991, Congress amended the WSRA to designate portions of the Niobrara as a scenic river even though the prior report and study required by 16 U.S.C. § 1275 had not been conducted. Niobrara Scenic River Designation Act of 1991, Pub.L. 102–50, 105 Stat. 254 (May, 24, 1991), codified as 16 U.S.C. § 1274(a)(117) (hereafter, Niobrara Act). A "scenic" river is one "free from impediments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads." 16 U.S.C. § 1273(b)(2).

The Secretary of the Interior administers the Niobrara Scenic River and its adjacent land area; the Secretary has delegated this authority to the director of the NPS. Defendant's Index of Evidence (Filing No. 41), Administrative Record of Boundary Decision at 916 (hereafter, AR). The delegation includes the responsibility for establishing the scenic river's boundaries "after consultation with State and local governments and the interested public," as well as for developing a general "comprehensive management plan." 16 U.S.C. § 1274(a)(117), 1274(b), 1274(d). The final boundaries are to include "an average of not more than 320 acres of land per mile measured from the ordinary high water mark on both sides of the river." 16 U.S.C. § 1274(b). Until final boundaries were published, however, a temporary boundary existed "one-quarter mile from the ordinary high water mark on each side of the river." 16 U.S.C. § 1275.

To carry out its delegated duties, the NPS launched a decision-making process that ultimately extended well beyond the one-year time limit found in 16 U.S.C. § 1274(b) for establishing "detailed boundaries" on designated rivers. The process the NPS devised incorporated boundary studies, the environmental impact statement (EIS) mandated by the NEPA (requiring an EIS for each "major Federal action[ ] significantly affecting the quality of the human environment,") 42 U.S.C. § 4332(2)(C), and the general management plan (GMP). The NPS formed a planning team which took in and analyzed extensive information from a broad array of public and private sources documented in the Administrative Record. The Secretary also appointed members to the Niobrara Scenic River Advisory Commission. Membership included landowners along the Niobrara; a canoe outfitter on the river; representatives from Brown, Cherry, Keya Paha, and Rock Counties, as well as from the Middle Niobrara Natural Resources District; a conservation group; and a representative from the governor's office. Niobrara Act, § 5. The Advisory Commission made significant contributions to the planning pro-

cess, and also received and discussed much of the public comment on the designation of the scenic river's boundaries. *See* AR 142, 180–86, 222, 241, 249–54, 280–84, 345–46, 363–68. The end result of the planning process was a draft GMP combined with a draft EIS dated August 1995. AR, Doc. 29.

The draft GMP/EIS identified three potential boundaries for the Niobrara Scenic River. The first alternative preserved the interim boundary described in the WSRA (a quarter of a mile from the ordinary high water mark on the river), and was drawn along section lines and public roads. AR, Doc. 29 at 38. The second alternative was drawn without regard to ownership of the land and included as many significant resources as possible along the river corridor within the acreage limits imposed by the WSRA. The "resources" were described as "unusual or excellent examples of plant ecosystems, areas visible from the river, fossil sites, prehistoric sites, historic sites, and areas near bridges." AR, Doc. 29 at 39. The third alternative took in the same resources except for scenic values, and contained a minimum setback of 200 feet above the ordinary high water mark. AR, Doc. 29 at 39. The issue in this case comes with a fourth boundary alternative discussed extensively throughout the planning process and in fact preferred by many members of the public living near the river and by local governments: the bank-to-bank alternative, discussed at length below in III(C). This alternative would have followed the ordinary high water mark and included no land owned by the farmers and ranchers along the river.

From March 1996 through May 1996, the NPS and the Advisory Council held numerous public meetings to discuss the draft GMP/EIS; they also received oral and written public comments. AR, Doc. 30 at 6. Pursuant to 16 U.S.C. § 1274(d), the NPS published notice of the completion and availability of the final GMP/EIS on September 5, 1996, at 61 Fed.Reg. 46821. AR 914. In the final GMP/EIS,

the NPS designated boundary alternative two, the boundary providing protection for "as many significant resources as possible along the river," as the preferred alternative. AR, Doc. 30 at 39. This alternative pulls in over 20,205 acres. *Id.*

On December 20, 1996, the NPS regional director issued a Record of Decision in which he adopted boundary alternative two as the boundaries of the Niobrara Scenic River. AR 916–924. Notice of the completion and availability of official boundary maps was published on May 27, 1997, at 62 Fed.Reg. 28730. AR 927. The NPS forwarded official boundary maps to Congress on January 12, 1998. AR 929–930. The boundaries became effective ninety days after they were forwarded to the President of the Senate and the Speaker of the House of Representatives. 16 U.S.C. § 1274(b).

### III. *Discussion*

#### A. Standard of Review

■ Review of final agency action under the NEPA is governed by the APA. *Gregson v. United States Forestry Serv.,* 19 F.Supp.2d 925, 928 (E.D.Ark.1998). A reviewing court must grant " 'substantial deference to the agency's interpretation of the statutes and regulations it administers.' " *Vue v. INS,* 92 F.3d 696, 699 (8th Cir.1996) (*citing Chevron USA, Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). A court's review is narrow in scope; it "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "Instead, it is to determine whether 'the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Gregson v. United States Forestry Serv.,* 19 F.Supp.2d at 928 (*quoting Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

The APA provides that an agency's decision will stand unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not supported by law." 5 U.S.C. § 706(2)(a); *Minnesota v. Apfel,* 151 F.3d 742, 745 (8th Cir.1998) (internal citations omitted). An agency decision is arbitrary and capricious if it offers "an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856. A court's review is limited "to the administrative record and issues presented to, and considered by, the agency." *Gregson v. United States Forestry Serv.,* 19 F.Supp.2d at 928 (*citing Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)). *See also Newton County Wildlife Ass'n v. Rogers,* 948 F.Supp. 50, 51–52 (E.D.Ark.1996), *aff'd,* 141 F.3d 803, 806 (8th Cir.1998).

I have carefully reviewed the two-volume Administrative Record, and I find that it is more than sufficient to permit me to resolve the legal issues raised by the parties' cross-motions for summary judgment. I stress that my review is a narrow one: "simply determining whether the [NPS] took a 'hard look' at the relevant factors and reached a decision that was neither arbitrary nor capricious. Administrative appeal challenges brought pursuant to the NEPA are limited to addressing whether the agency complied with the NEPA's procedural mandates." *Id.* at 931 (internal citation omitted).

## B. "Detailed Boundaries"

In the Niobrara Act, Congress designated the Niobrara River as a component of the Wild and Scenic River System. It then directed that the "agency charged with the administration of each component of the national wild and scenic rivers system" was to "establish detailed boundaries" of the new scenic river which "include[d] an average of not more than 320 acres of land per mile measured from the ordinary high water mark on both sides of the river . . . ." 16 U.S.C. § 1274(b). The boundaries were to include not only the actual river itself, but also "the related adjacent land area that possesses one or more of the values referred to in section 1271 . . . ." 16 U.S.C. § 1273(b). These values include "outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values." 16 U.S.C. § 1271.

The plaintiff contends that the NPS, as the "agency charged with the administration of each component of the national wild and scenic rivers system," overstepped its authority when establishing the boundaries required by section 1274(b). The plaintiff argues that the NPS failed to apply the "outstandingly remarkable" standard contained in section 1271, substituting instead its own lesser standard for the statutory standard. As a result, the NPS allegedly pulled within the boundaries of the Niobrara Scenic River adjacent land that had only "significant" or "important" values. The plaintiff insists that "significant" values are not synonymous with "outstandingly remarkable" values.

The defendants deny that the NPS used any standard other than the statutory standard of "outstandingly remarkable." William F. Conrad, the NPS Resource Management Specialist on the Niobrara Scenic River Project, admitted that participants on the planning team early on began substituting the words "significant" and "important" for the term "outstandingly remarkable." He testified that they

chose not to use that term ["outstandingly remarkable"] because it is such a tongue twister. It's hard to say. If you're discussion [sic] something over and over again, it would just be an impediment to communication. That's not a term that is used in ordinary conversation. And the agency policy for documents is to strive to use terms that the average layman can understand who is interested in that field but not a practi-

tioner of it. . . . We didn't find outstandingly remarkable as an ordinary term, you know, that the average person would relate to. We also found it cumbersome just in planning meetings. We generally like to talk about is it significant or not, or to what extent is it significant.

.    .    .    .    .

Well, the draft plan explains the use of significance in the context of the Wild and Scenic River language of outstandingly remarkable, and it basically says that the term significant or important is easier to use, and therefore through the document—through the Draft General Management Plan the term significant or important—and I can't remember if there was another adjective—those terms were the operative terms through the document.

Defendants' Index of Evidence (Filing No. 55), Dep. of Wm. Conrod at 34:2–10, 17–22; 37:2–11 (hereafter, Defendants' Index).

The term "outstandingly remarkable" is not defined in the WSRA or in any agency regulations. Therefore, because "the statute is silent or ambiguous on the question at issue, the court considers whether the agency interpretation [of the term "outstandingly remarkable"] 'is based on a permissible construction of the statute.'" *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1121 (8th Cir.1999) (*quoting Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. at 843, 104 S.Ct. 2778).

■ I find that the NPS interpretation of the term "outstandingly remarkable" as synonymous with "significant" or "important" is not only permissible but an eminently practical way of promoting the objectives of the WSRA. The NPS took an undefined statutory term that was clumsy to use in discussion, whether among the planning team or with the public, and expressly substituted two other terms commonly understood and easily evaluated. This substitution was not sleight-of-hand

to deceive the public. The NPS clearly stated in official documents that the terms were synonymous.

For example, both the draft and the final GMP/EIS expressly announce that the terms "outstandingly remarkable" and "significant" or "important" are interchangeable: "The legislative language [outstandingly remarkable] is not repeated throughout this document. Rather than 'outstandingly remarkable,' 'significant' or 'important' are used." AR, Doc. 29 at 1 and Doc. 30 at 1. *See also* AR, Doc. 29 at 10 and Doc. 30 at 11 ("Area features were analyzed and listed for consideration. These features make this place important and different, or 'outstandingly remarkable.' "); AR, Doc. 29 at 112 and Doc. 30 at 208 (glossary definition of "significant resources": "the area's important resources as listed in the significance statements, including scenic vistas; habitat for endangered, threatened, and rare species; exceptional biological diversity; scientifically important fossil deposits; historic and prehistoric cultural resources; visitor use and access areas; for purposes of this document, significant was used in place of 'outstandingly remarkable,' the legislative language.") The Record of Decision also plainly declares that the boundary alternative finally chosen, the so-called "resource driven" alternative, "was drawn to include as many outstandingly remarkable features as possible along the river corridor within the legislated acreage limits of the Wild and Scenic Rivers Act." AR 918.

The NPS drew on myriad sources to identify the outstandingly remarkable values mentioned in 16 U.S.C. § 1271 which had led Congress to designate the Niobrara River and its adjacent land—even without the study and report mandated by 16 U.S.C. § 1275(a) component of the Wild and Scenic River System. Following this designation and as directed by 16 U.S.C. § 1274(b), NPS drew the boundaries of the Niobrara Scenic River to include as many of those values as possible. Significantly, section 1274(b) does not direct that

boundaries shall be drawn only along the outstandingly remarkable features of the river; in fact, the term "outstandingly remarkable" is nowhere mentioned in the section. Rather, section 1274(b) only limits how much land can be included within the boundaries: "boundaries shall include an average of not more than 320 acres of land per mile measured from the ordinary high water mark on both sides of the river." 16 U.S.C. § 1274(b). The plaintiff has not alleged, nor could he, that the NPS exceeded this acreage limitation on the boundaries of the Niobrara Scenic River set by Congress.

■ The plaintiff also alleges that the NPS has not established the "detailed" boundaries required by the statute because it has not located the proposed boundaries "on the face of the earth," *i.e.*, has not physically posted or fenced the boundaries along the river. The NPS maintains, however, that it does not need to survey or mark the boundaries at this time because the boundaries "do not affect title or any other interest in the real property located within the boundaries." Defendants' Brief at 20; AR, Doc. 30 at 38. The NPS describes the geographic boundaries of the Niobrara Scenic River as "administrative" rather than "ownership" boundaries. Defendants' Index of Supplemental Evidence, Dec. of G.V. Noice at 4, ¶ 10. Administrative boundaries

> do not define any interest in real property, only a 'sphere of influence.' The bundle of rights impacted by that sphere of influence is far less than those involved with ownership. For that reason, administrative boundaries seldom justify the time, money, and effort the NPS would have to expend to perform a formal survey or to post or otherwise mark them in the ground.... The NPS has no administrative jurisdiction over the day-to-day activities of local landowners, who can cross the boundaries of the Scenic River at will....

*Id.*, ¶¶ 8, 13. The NPS thus simply has no ownership interest in the land within the

boundaries except insofar as 16 U.S.C. § 1277 authorizes the NPS to acquire a scenic easement or a fee interest. And even if the NPS were to exercise eminent domain, the Niobrara Act substantially limits land acquisition along the river by providing that the NPS cannot acquire without the consent of the owner "land or interests in land in more than 5 percent of the area within the boundaries [of the scenic river]" nor "fee ownership of more than 2 percent of such area." Niobrara Act, § 4(a).

■ Finally, the plaintiff also attacks the boundary alternative selected by complaining of the process by which the NPS evaluated the land adjacent to the river for "outstandingly remarkable" values. For example, the plaintiff takes the NPS to task for having physically inspected only about 1000 acres—less than ten percent—of the land eligible for inclusion in the scenic river boundaries. Plaintiff's Brief in Support of Motion for Summary Judgment at 3. The plaintiff suggests that computer models and technical information derived from other federal, state, and local experts cannot substitute for personal observation and evaluation of "outstandingly remarkable" values. *Id.* at 3–4.

However, decisions about what particular values of the Niobrara River were outstandingly remarkable and about what land should be included within the boundaries of the Niobrara Scenic River were matters that Congress committed to the discretion of the NPS, "the agency charged with administration of" the Niobrara Scenic River. 16 U.S.C. § 1274(b). *See Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). I find it difficult to give much weight to the plaintiff's argument that the NPS's action in setting the boundaries was arbitrary, capricious, or otherwise contrary to law merely because the NPS planning team did not walk upon or visually inspect every last acre of the 20,000 acres eventually included. The AR is replete with extremely detailed data from state, local, and fed-

eral experts and professionals as well as from landowners and other interested private citizens—information which the NPS sought out, analyzed, and included in the final GMP/EIS where appropriate. *See, e.g.,* AR, Doc. 30 at 97–99, "Consultation and Coordination." The plaintiff cannot seriously contend that the NPS should have reinvented the wheel by conducting its own independent study of the archaeological, historical, topological, cultural, hydrological, recreational, paleontological, fish and wildlife, and geologic values of the Niobrara River Valley. I find that the NPS evaluation of resources to be included in the boundary of the Niobrara Scenic River well within the agency's expertise. The selection of boundary alternative two was thus neither arbitrary nor capricious.

### C. "Bank–to–Bank Alternative"

The NEPA requires an agency preparing an EIS to consider alternatives to any proposed action which "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(2(C)). Regulations discussing these EIS alternatives provide that agencies must "rigorously explore and objectively evaluate all reasonable alternatives, and for the alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.12 (1996).

■ The plaintiff argues that final GMP/EIS prepared for the Niobrara Scenic River was deficient because it failed to "rigorously explore and objectively evaluate" a boundary alternative popular with landowners and local governments along the river: the bank-to-bank alternative. This alternative "would follow the ordinary high water mark on the riverbank and include no land above the bank." AR, Doc. 30 at 39.

The NPS officially rejected the bank-to-bank alternative in a July 1994 memorandum written by Dennis Galvin, the NPS Associate Director for Planning and Development. AR 655. Galvin advised that

"Congress does not expect that the wild and scenic river designation will protect only the water column." *Id.* at 1. Rather, Congress designates a river as wild or scenic also to protect the "outstanding natural, recreational and cultural values of the river area." *Id.* at 1–2. The statute plainly says that "it is the policy of the United States" to protect selected rivers "with their immediate environments." 16 U.S.C. § 1271. Further, Galvin noted, the statute provides that

[e]ach component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values. In such administration primary emphasis shall be given to protecting its esthetic, scenic, historic, archaeologic, and scientific features.

16 U.S.C. § 1281(a). Galvin concluded that a bank-to-bank alternative fails to reflect congressional intent because it cannot protect significant land resources beyond the water column.

In the final GMP/EIS, the NPS stated that it had considered the bank-to-bank alternative but eliminated it from further consideration because "Congress did not expect that the wild and scenic river designation would protect only the water column but [would] allow[ ] the standard boundary provisions of the Wild and Scenic River Act to apply." AR, Doc. 30 at 40. The Record of Decision states that the NPS selected the resource-driven boundary alternative "because it most fully implements and complies with the intent of the Wild and Scenic Rivers Act which names not only rivers but refers to 'their immediate environments' for protection." AR 918.

I find that the NPS complied with the requirements of 40 C.F.R. § 1502.12 in eliminating from consideration the bank-to-bank boundary alternative. The final

GMP/EIS briefly discussed the reason for eliminating the alternative by explaining the provisions of the WSRA. By the very terms of the statute, an alternative that protected only the water in the river would have failed to protect the "immediate environments" of the river, 16 U.S.C. § 1271, and the "related adjacent land area" around the river, 16 U.S.C. § 1273(b). The bank-to-bank alternative would protect even less land than the interim boundaries set in 16 U.S.C. § 1275. The bank-to-bank alternative thus was not "reasonable" under the NEPA regulations and hence the NPS could eliminate it from consideration with only a brief discussion. The NPS's decision to do so was "not arbitrary, capricious, an abuse of discretion, or otherwise not supported by law." *Friends of the Boundary Waters Wilderness v. Dombeck,* 164 F.3d 1115, 1999 WL 3942, *3 (*quoting Minnesota v. Apfel,* 151 F.3d 742, 745 (8th Cir.1998)).

IT IS THEREFORE ORDERED that

1) The defendants' motion for summary judgment (Filing No. 47) is granted; and

2) The plaintiff's motion for summary judgment (Filing No. 49) is denied.