United States of America v. Memorial Sloan-Kettering Cancer Center

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued:  July 8, 2008                                    Decided: March 25, 2009)

Docket Nos. 07-0926-cv(L), 07-0949-cv(Con)

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*-v.-*

MEMORIAL SLOAN-KETTERING CANCER CENTER,

*Defendant-Appellant.*

_____

ALBANY MEDICAL CENTER,

*Plaintiff-Appellant,*

*-v.-*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

_____

These two cases, *Albany Medical Center v. United States* ("*AMC*") and *United States v.*

*Memorial Sloan-Kettering Cancer Center* ("*Sloan-Kettering*"), decided respectively by the

United States District Courts for the Northern and Southern Districts of New York, both raise the

question of whether post-graduate medical residents can invoke the Federal Insurance Contributions Act ("FICA") tax exemption for "students."  In each case, the district court ruled that, as a matter of law, post-graduate medical residency programs are not "schools" and medical residents are not "students."  *Sloan-Kettering* raises the further question of whether the monies that the Cancer Center pays to its residents are "scholarships" and therefore exempt from FICA taxes.  The district court answered "no" to that question.

We hold that both district courts erred in ruling as a matter of law that medical residents are categorically ineligible for the FICA tax exemption for students.  We affirm the United States District Court for the Southern District of New York, however, insofar as it determined that the monies paid by the Cancer Center to medical residents are not scholarships.  We remand both cases to the respective district courts for further proceedings consistent with this opinion.

—————————————

MARK H. CHURCHILL, McDermott Will & Emery LLP, Washington, D.C. (Joel E. Cohen, McDermott Will & Emery LLP, New York, New York, Christopher Kliefoth, Sarah E. Hancur, McDermott Will & Emery LLP, Washington, D.C., *on the brief*), *for Plaintiff-Appellant Albany Medical Center*.

MARK H. CHURCHILL, McDermott Will & Emery LLP, Washington, D.C. (Christopher Kliefoth, Teresa M. Goody, McDermott Will & Emery LLP, Washington, D.C., Joel E. Cohen, McDermott Will & Emery LLP, New York, New York, *on the brief*), *for Defendant-Appellant Memorial Sloan-Kettering Cancer Center*.

TERESA E. MCLAUGHLIN, Attorney, Tax Division, Department of Justice, Washington, D.C. (Richard T. Morrison, Acting Assistant Attorney General, Gilbert S. Rothenberg, Acting Deputy Assistant Attorney General, Michelle B. Smalling, Attorney, Tax Division, Department of Justice, Washington, D.C., *on the brief*, Glenn T. Suddaby, United States Attorney for the Northern District of New York, *of counsel*), *for Defendant-Appellee United States of America*.

2

ROSS E. MORRISON, Assistant United States Attorney (David S. Jones, Assistant United States Attorney, *on the brief*), *for* Michael J. Garcia, United States Attorney for the Southern District of New York, New York, New York, *for* Plaintiff-Appellee United States of America.

———————————————

BEFORE: POOLER, HALL, *Circuit Judges*, and TRAGER, *District Judge.*[*]

*Judge* TRAGER dissents in a separate opinion.

———————————————

HALL, *Circuit Judge*:

These two cases, *Albany Medical Center v. United States* ("*AMC*") (Scullin, *J.*) and *United States v. Memorial Sloan-Kettering Cancer Center* ("*Sloan-Kettering*") (Hellerstein, *J.*), decided respectively by the United States District Courts for the Northern and Southern Districts of New York, both raise the question of whether post-graduate medical residents can invoke the Federal Insurance Contributions Act ("FICA") tax exemption for "students." In each case, the district court ruled that, as a matter of law, post-graduate medical residency programs are not "schools" and medical residents are not "students." *Sloan-Kettering* raises the further question of whether the monies that the Cancer Center pays to its residents are "scholarships" and therefore exempt from FICA taxes. The district court answered "no" to that question.

We hold that both district courts erred in ruling as a matter of law that medical residents are categorically ineligible for the FICA tax exemption for students. We affirm the District Court for the Southern District of New York, however, insofar as it determined that the monies paid by

---

[*] The Honorable David G. Trager, of the United States District Court for the Eastern District of New York, sitting by designation.

the Cancer Center to medical residents are not scholarships. We remand both cases to their respective district courts for further proceedings consistent with this opinion.

## BACKGROUND [1]

### I. Overview of Post-Graduate Medical Residency Programs

After completing medical school and receiving a doctor of medicine ("M.D.") degree, prospective physicians commence the graduate phase of their medical education. Generally, graduate medical education consists of a residency or fellowship. Most states, including the State of New York, require physicians to complete a residency program of at least one year before becoming eligible for a medical license. Residency programs typically last between three and five years.

These residency programs are accredited by organizations such as the Accreditation Council for Graduate Medical Education ("ACGME"). The ACGME requires residency programs to be organized educational programs that combine a didactic curriculum with direct exposure to patient care under the supervision of attending physicians. Accordingly, these programs include classroom lectures, daily rounds with an attending physician, Grand Rounds in which experts present research, morbidity and mortality conferences, and reading assignments. Residents are tested and evaluated at times, and those residents who have not mastered necessary skills are given remedial instruction or required to repeat the program. Both Memorial Sloan-Kettering Cancer Center ("the Cancer Center") and the Albany Medical Center ("AMC") (collectively, "the Hospitals") claim that residents participate in patient care only as a way of

---

[1] Most of the facts are not in dispute, and those facts that are in dispute are noted.

learning how to care for patients; that any benefit to the hospitals resulting therefrom is entirely incidental; that the hospitals do not meet staffing needs through their residents; and that the hospitals cannot bill for care provided by a resident.

Residents receive funds from the hospital. The Hospitals characterize these monies as "a scholarship or fellowship to aid in the pursuit of their graduate medical education" or as a "stipend." The Government characterizes these monies as compensation for the provision of services. The Hospitals point out that the ACGME requires, as a condition of accreditation, that the Hospitals provide residents with the financial support needed to ensure the residents' participation in the residency programs.

Although we refer to the Cancer Center and AMC as "the Hospitals," the precise institutional arrangements are slightly more complicated than that term would suggest. The Albany Medical Center is a private corporation that administratively links the Albany Medical College with the Albany Medical Center Hospital. Graduate medical programs, including the residency program, are under the primary control of the College, but AMC and the Albany Medical Center Hospital also participate in the program. College faculty supervise and train the residents, and the residency program is directed by the College's Associate Dean for Graduate Medical Education. Memorial Sloan-Kettering Cancer Center is comprised of three entities: Memorial Hospital for Cancer and Diseases ("Memorial Hospital"), Sloan-Kettering Institute for Cancer Research ("Sloan-Kettering Institute"), and the Memorial Sloan-Kettering Cancer Center ("the Cancer Center"). The Cancer Center, a teaching institution, is affiliated with the Weill Medical College of Cornell University. The Cancer Center's staff physicians are all on the faculty at Cornell.

5

## II. The Hospitals' Claims and Proceedings Below

### A.     Common Claims

Both Hospitals argue that they and their residents should not be required to pay Federal Insurance Contributions Act ("FICA") payroll taxes on the monies paid by the Hospitals to medical residents. FICA funds Social Security through payroll taxes. One of its provisions, the so-called "student exception," excludes from the definition of "employment" any services performed by a student "in the employ of a school, college, or university[,] . . . who is enrolled and regularly attending classes at such school, college, or university." 26 U.S.C. § 3121(b)(10). Both Hospitals contend that work performed by their residents falls within this exception. The Cancer Center also relies on FICA's exclusion of "scholarships" from its definition of taxable wages. FICA imposes a tax only on "wages," which the statute defines as "all remuneration for employment," with certain exceptions. 26 U.S.C. § 3121(a). The Cancer Center claims that the funds it pays to residents are non-compensatory scholarships and therefore do not constitute "wages" under § 3121(a).

### B.     *Albany Medical Center v. United States*

AMC, which acted as the payroll agent for the monies paid to residents, traditionally paid FICA taxes on those monies. After an Eighth Circuit decision holding that residents were eligible to apply for a similarly worded student exception under 42 U.S.C. § 410(a)(10), *see Minnesota v. Apfel*, 151 F.3d 742, 747-48 (8th Cir. 1998), AMC filed a refund application for the FICA taxes it had paid on resident monies between 1995 and 1999. The total amount of the

6

claimed refund—which included both the employer and employee FICA contributions—was approximately $7.3 million.

When the Internal Revenue Service ("IRS") did not act on the claim, AMC filed a refund lawsuit against the IRS in the Northern District of New York in December 2004. The Government moved for summary judgment in October 2005. It argued then, as it does now, that AMC's residents were ineligible for the student exception as a matter of law. On January 10, 2007, the district court (Scullin, *J*.) granted summary judgment in favor of the Government.

The district court first agreed with the Government that the language of the student exception was ambiguous. The court acknowledged that residency programs had an educational component, but it observed that patient care was also important. Because it was unable, in light of these conflicting aspects of residency programs, to determine whether medical residents were students by reference to the statutory text alone, the court found it appropriate to review the legislative history. The court observed that when engaging in this interpretive exercise, it was required to "interpret federal social security legislation liberally" and "resolve any doubts in favor of coverage rather than exclusion." *Albany Med. Ctr. v. United States*, No. 04 Civ. 1399, 2007 U.S. Dist. LEXIS 1929, at *6 (N.D.N.Y. Jan. 10, 2007).

Turning to the legislative history, the district court found that Congress had not intended medical residents to be eligible for the student exception. When Congress first established the student exception in 1939, it also enacted a separate exemption for work done by post-graduate medical interns. In 1965, however, Congress eliminated the medical intern exception. From this history, the district court concluded that Congress had intended the exceptions to be narrowly construed. It further found that if the student exception were interpreted as including residents,

7

the intern exception would have been redundant from the start. Wary of interpreting the statute in a manner that rendered some of its language surplusage, the district court ruled that medical interns (and therefore medical residents) had never been eligible for the student exception.

Based on its finding that residents were ineligible for the student exception as a matter of law, the district court granted summary judgment to the Government.

### C. *Memorial Sloan-Kettering Cancer Center v. United States*

The Cancer Center also filed a refund application with the IRS. The Cancer Center premised its request for a refund on two assertions. First, it claimed that the monies that it paid to residents were "scholarships" under the statute and therefore not subject to FICA. Second, it argued that residents were eligible for the student exception to FICA. The IRS granted the application and refunded FICA taxes that the Cancer Center had paid between 2001 and 2003.

On January 3, 2006, the Government reversed its position and sued to recover the refunded FICA taxes. Ten months later, the Government moved for summary judgment, arguing that (1) the monies paid by the Cancer Center to residents were not scholarships, because residents are required to perform services in exchange for the funds, and (2) residents are ineligible for the student exception as a matter of law. With respect to the Cancer Center's scholarship claim, the Government argued that the Cancer Center's residency contracts require its residents to provide patient care services, and thus the monies paid by the Cancer Center to residents could not be considered "scholarships."

The district court (Hellerstein, *J.*) issued an oral decision. At the start of the hearing, the court expressed some skepticism of the Cancer Center's assertion that it did not benefit from the

8

patient care services provided by residents. The court noted that, during the early years of their careers, professionals often learn more from their employment positions than they contribute in those positions, but the court also told the Cancer Center's counsel that "[y]ou can't say the hospital doesn't benefit from the residents." When counsel responded that the Cancer Center did not bill patients for care provided by residents, the district court asked whether the cost of the resident services might be built into the cost of other hospital fees and stated that the Cancer Center had no way to prove otherwise. Unlike scholarships, the court noted that to receive these monies, "[t]here's no needs test" or any other "set of considerations that are customary for award of scholarships."

After extensive questioning by the court and lengthy arguments by both sides, the district court held that "the government is entitled to summary judgment and that FICA was payable on the compensation paid to residents and other fellows . . .." In so doing, the court first ruled that the monies paid to residents were not scholarships because residents were required to provide patient care services in return for the funds. Moving on to the student exception, the court held that residents were not students and could not invoke the student exception. Though it noted, in passing, that "by reason of the contract drawn up with a resident, the residents are not students," it focused on the legislative history and found that Congress had intended FICA to apply to residents. "The amounts paid to them for the purpose of the act are considered compensation. The fact that they have another motive as well is beside the point . . .." The court, therefore, granted summary judgment to the Government.

**DISCUSSION**

We review "a grant of summary judgment *de novo*." *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008).

**I.  The Student Exception**

**A.        The Statutory and Regulatory Text**

FICA imposes payroll taxes on "wages," which it defines as "remuneration for employment," with certain exceptions.  26 U.S.C. § 3121(a).  The student exception excludes from the definition of "employment" any "service performed in the employ of . . . a school, college, or university . . . if such service is performed by a student who is enrolled and regularly attending classes at such school, college, or university."  26 U.S.C. § 3121(b)(10).  At the time of the events at issue in these cases,[2] the implementing regulations stated that "[t]he term 'school,

---

[2] On December 21, 2004, the IRS issued an amended version of the student exception regulation that restricted its availability and more specifically limited its applicability to medical residents.  Student FICA Exception, 69 Fed. Reg. 76404 (Dec. 21, 2004) (to be codified at 26 C.F.R. Pt. 31).  The amendment imposed new requirements for institutions claiming to be "schools," and in the course of doing so it rejected commentary in favor of considering teaching hospitals to be schools.  *Id.* at 76405.

The new regulation includes a list of examples, and one of those examples addresses whether medical residents are eligible for the student exception.  The example describes a situation that would likely include the residency programs at issue here:

> Employee E is employed by University V to provide patient care services at a teaching hospital . . . . as part of a medical residency program . . . . The residency program . . . is accredited by the Accreditation Counsel for Graduate Medical Education.  Upon completion of the program, E will receive a certificate of completion, and be eligible to sit for an examination required to be certified by a recognized organization in the medical specialty.  E's normal work schedule, which includes services having an educational, instructional, or training aspect, is 40 hours or more per week.

26 C.F.R. § 31.3121(b)(10)-2(e)(4)(I) (2004).

The regulation unambiguously makes clear that residents enrolled in such a program would not be considered students:

college, or university' . . . is to be taken in its commonly or generally accepted sense." 26 C.F.R.

§ 31.3121(b)(10)-2(d). The regulation further stated that whether an individual was a student

depended on "the basis of the relationship of such employee with the organization for which the

services are performed":

> An employee who performs services in the employ of a school, college, or
> university, as an incident to and for the purpose of pursuing a course of study at
> such school, college, or university has the status of a student in the performance of
> such services.

*Id.* § 31.3121(b)(10)-2(c). "[T]he amount of remuneration for services performed by the

employee . . . , the type of services performed by the employee, and the place where the services

are performed are immaterial." *Id.* § 31.3121(b)(10)-2(b). Instead, eligibility for the exception

depends on "(1) the character of the organization . . . as a school, college, or university . . . , and

(2) the status of the employee as a student enrolled and regularly attending classes . . . ." *Id.*

### B.    Textual Ambiguity

Both district courts found this statutory and regulatory framework ambiguous as to

whether medical residents can apply for the student exception, and both courts consequently

---

> In this example, E is employed by V, a school, college, or university within the meaning
> of paragraph (c) of this section. However, E's normal work schedule calls for E to
> perform services 40 or more hours per week. E is therefore a full-time employee, and the
> fact that some of E's services have an educational, instructional, or training aspect does
> not affect that conclusion. . . . Accordingly, E's services are not excepted from
> employment under section 3121(b)(10) and there is no need to consider other relevant
> factors, such as whether E is a professional employee or whether E is eligible for
> employment benefits.

*Id.* § 31.3121(b)(10)-2(e)(4)(ii).

Because the regulation applies only "to services performed on or after April 1, 2005," *id.*
§ 31.3121(b)(10)-2(f), however, we do not apply it or consider it here.

11

relied on the legislative history of the student exception to find that medical residents are categorically ineligible. The first question we face, therefore, is whether the statute is ambiguous with respect to medical residents' eligibility for the exception, for "[o]nly if we discern ambiguity do we resort . . . to canons of statutory construction . . . [and] to legislative history," *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005) (citations omitted).

The Hospitals argue that the student exception is not ambiguous, as it clearly establishes that students who work for the educational institutions they attend are exempt from FICA. They point out that the language of the student exception consists of "basic, easily understood words," and they contend that whether medical residents are "students" is therefore a question of fact rather than a question of law. The Government first responds that if the term "student" has an unambiguous meaning, that meaning does not encompass residents, who are not "students" as that term is generally used. The Government believes the statute is ambiguous, however, because it does not detail the circumstances that make an individual a student and does not, on its face, answer the question of whether medical residents are students.

In *United States v. Mount Sinai Medical Center of Florida*, 486 F.3d 1248 (11th Cir. 2007), the Eleventh Circuit addressed the same question. There, the district court had looked to legislative history and concluded that medical residents were categorically ineligible for the student exception. *Id.* at 1251. The Eleventh Circuit held that the district court had erred when it "relied on legislative history without first determining whether the language of the statute was ambiguous." *Id.* The court found that the statutory meaning was "plain" and that "[w]hether a medical resident is a 'student' and whether he is employed by a 'school, college, or university' are separate factual inquiries that depend on the nature of the residency program in which the

12

medical residents participate and the status of the employer."[3]  *Id.* at 1252.  The Eleventh Circuit

refused to "review the legislative history of this statute to create an ambiguity where there is

none."  *Id.*

The Eighth Circuit reached a similar conclusion in *Minnesota v. Apfel*, 151 F.3d 742 (8th

Cir. 1998), the issuance of which has spurred the current wave of litigation over the status of

medical residents.  In *Apfel*, the Eighth Circuit considered whether medical residents were

exempt from social security taxes under an agreement between Minnesota and the federal

government, the terms of which were governed by a statute containing an identically worded

student exemption to the one at issue here.[4]  *Id.* at 747 (discussing student exception provision of

42 U.S.C. § 410(a)(10)).  The Eighth Circuit first held that no taxes were due based on the

interpretation of a contract between the Government and the State.  *Id.*  Then, however, the court

reviewed the district court's alternative holding that medical residents fell under the student

exception.  *Id.*  The Eighth Circuit rejected the Government's argument that residents were

categorically ineligible for the exception, holding that eligibility depended on "a case-by-case

---

[3] On remand, the district court found that the residents at Mount Sinai Medical Center met the definition of "students" and that Mount Sinai qualified as a "school, college, or university" for purposes of the FICA student exception.  *United States v. Mount Sinai Med. Ctr. of Fla.*, No. 02 Civ. 22715, 2008 U.S. Dist. LEXIS 57808, at *6 (S.D. Fla. July 28, 2008).  The district court observed that Mount Sinai, as a teaching hospital, "plays a vital function in today's world of graduate medical education" and that "[n]o other institutions in the United States, other than teaching hospitals like Mount Sinai, carry out this essential role and function."  *Id.*  The court also found that the "tipping point" for the student Exemption from FICA taxes is "the completion of the full residency (or fellow) program . . . at a teaching hospital . . .."  *Id.* at *7-8.

[4] Although the statute analyzed in *Apfel* pertains to the definition of employment for purposes of provisions of the social security statute covering benefits, we have no occasion to address the question of whether our holding with respect to 26 U.S.C. § 3121(b)(10) has any bearing on eligibility for benefits.

13

examination" to determine whether residents' relationship with the hospital was "primarily for educational purposes or primarily to earn a living." *Id.* at 748. The court then affirmed the district court's finding that the residents fell within the scope of the exception. *Id.*

The Sixth and Seventh Circuits have recently joined the Eleventh and Eighth Circuits in holding that the student exception is not per se inapplicable to medical residents. *Univ. of Chi. Hosp. v. United States*, 545 F.3d 564 (7th Cir. 2008). The Seventh Circuit concluded that the statute's silence on the specific issue of whether medical residents qualify for the student exception did not amount to ambiguity. *Id.* Thus, it was not persuaded by the Government's arguments based "on inferences drawn from statutory and legislative history." *Id.* at 567. Rather, the Seventh Circuit held that even if it were to conclude that the statute was ambiguous, it would "turn first to the applicable Treasury Regulation," which "prescribes a case-specific test for whether the student exception applies" and renders immaterial the "amount the employee is paid, the type of services performed, and the place where services are performed." *Id.* at 568 (citing 26 C.F.R. § 31.3121(b)(10)-2).

Similarly, the Sixth Circuit has concluded that, while the meaning of "student" is a legal issue, the question of whether particular residents are students is a factual one. *United States v. Detroit Med. Ctr.*, --- F.3d ---, 2009 WL 465543, at *6 (6th Cir. Feb. 26, 2009). The Sixth Circuit observed that the "statute does not define 'student' but merely specifies where and how the student must be studying for the exemption to apply." *Id.* at *5. The Sixth Circuit looked to the ordinary meaning of the word "student" and the Treasury regulation, which "says that '[a]n employee who performs services in the employ of a school, college, or university, as *an incident to* and for *the purpose of pursuing a course of study* at such school, college, or university has the

14

status of a student in the performance of such services.'" *Id.* (quoting 26 C.F.R. § 31.3121(b)(10)-2(c)) (emphasis added in *Detroit Med. Ctr.*). Thus, to determine whether the residents were students, the court "need[ed] to know what the residents in the program do and under what circumstances." *Id.*

We agree with the Sixth, Seventh, and Eleventh Circuits that the statute is unambiguous and that whether medical residents are "students" and the Hospitals "schools" is a question of fact, not a question of law. The statute expressly defines which individuals fall within the scope of the student exception:  students who are "enrolled and regularly attending classes." 26 U.S.C. § 3121(b)(10). It also establishes the types of employment that qualify for the student exception: "service performed in the employ of . . . a school, college, or university." *Id.* This language is not ambiguous, and in their effort to invoke the student exception, the Hospitals do not urge us to adopt an unusual or strained interpretation of the statutory text. They seek only the opportunity to prove, through the introduction of evidence, that their residents come within the terms of the text. The Government's primary argument is that the fact Congress repealed a separate exemption for services performed by hospital interns in 1965 demonstrates that Congress did not believe that medical residents would fall within the scope of the student exception. Like the Eleventh Circuit, "we [will] not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994); *see also Mount Sinai*, 486 F.3d at 1252.

Even if we were to find ambiguity in the statute, the method for resolving the ambiguity is found in the implementing regulations. Those regulations require courts to give the term "school, college, or university" "its commonly or generally accepted" meaning. 26 C.F.R. § 31.3121(b)(10)-2(d). The regulations further require courts to decide whether an individual is a

15

"student" by examining the unique circumstances surrounding the individual's relationship with the school, including "the basis of the relationship of such employee with the [school]," "the character of the organization . . . as a school, college, or university," and "the status of the employee as a student enrolled and regularly attending classes." *Id.* § 31.3121(b)(10)-2(c). The Government does not argue that this regulation conflicts with the legislative history or is otherwise invalid. In any event, as the Seventh Circuit held, "we need not . . . attempt to reconcile the statutory and legislative history of the intern exception with the student exception or the applicable Treasury Regulation," because "the statute unambiguously does not categorically exclude medical residents from eligibility for the student exception." *Univ. of Chi. Hosp.*, 545 F.3d at 570.

Because the student exception is unambiguous, both district courts erred in ruling that medical residents are ineligible for the exception as a matter of law. We agree with the Eleventh Circuit that "[w]hether a medical resident is a 'student' and whether he is employed by a 'school, college, or university' are separate factual inquiries that depend on the nature of the residency program in which the medical residents participate and the status of the employer." *Mount Sinai*, 486 F.3d at 1252. Accordingly, both cases must be remanded for "a particularized review of whether [the Hospitals'] medical residents qualify for the student exclusion." *Univ. of Chi. Hosp. v. United States*, No. 05 Civ. 5120, 2006 U.S. Dist. LEXIS 68695, at *14 (N.D. Ill. Sept. 8, 2006), *aff'd* 545 F.3d 564 (7th Cir. 2008).

16

## C.     Legislative History

Although we find the statute unambiguous and rule in favor of the Hospitals on that basis, we take a moment to address the Government's claim that if we were to look to the legislative history, we would rule in favor of the Government.

When Congress first enacted the FICA tax in 1935, it did not include the student exception or any other relevant exception.  1933 Social Security Act, § 901, 49 Stat. 639 (1935).  In 1939, Congress amended the statute and added the precursor to the student exception.  Internal Revenue Code of 1939, § 1426(b)(13), 53 Stat. 1384-85 (1939).  At this time, Congress also added the intern exception, which excluded from the definition of "employment" "service performed as an interne [sic] in the employ of a hospital by an individual who has completed a four years' course in a medical school chartered or approved pursuant to State law."  *Id.* at 1385.  The Government argues that the coexistence of the student exception and the intern exception demonstrates that Congress did not believe that medical interns would fall within the scope of the student exception, and that, *a fortiori*, medical residents—who are even further removed from enrollment in medical school classroom studies—would not fall within the student exception either.  According to the Government, if medical interns and medical residents were eligible for the student exception, the intern exception would have been surplusage.

Fifteen years after Congress enacted the two exceptions, however, St. Luke's Hospital in Cleveland brought a lawsuit claiming that medical residents fell within the intern exception.  *See St. Luke's Hosp. Ass'n of Cleveland, Ohio v. United States*, 333 F.2d 157 (6th Cir. 1964).  St. Luke's argued that its residents were "doctors-in-training" and therefore within the terms of the intern exception.  *Id.* at 158.  Evidence showed that residency programs had expanded since

17

1939. *Id.* While the term "resident," in 1939, "referred to a graduate physician, licensed to practice medicine, who served on the [hospital] staff" and who may or may not have been undergoing training, residency programs in 1964 were designed "for training of physicians in specialized branches of medicine leading to examination and certification by specialty boards." *Id.* at 161. Thus, while the term "intern" had come to indicate "graduate doctors," the term "resident-in-training" had come to connote individuals "still in training status." *Id.*

The Sixth Circuit held, however, that residents were ineligible for the intern exception. Although the distinctions between medical interns and residents had been "substantially reduced," the two terms continued to describe two discrete categories of individuals, as they had when the intern exception was enacted in 1939. *Id.* at 164. The court acknowledged that changing circumstances might counsel in favor of expanding the intern exception to include residents, but it found that "meeting these changed conditions, if indeed there is warrant for doing so at all, is the function of legislation and not that of judicial interpretation." *Id.*

The following year, Congress repealed the intern exception altogether. *See* Social Security Amendments of 1965, Pub. L. No. 89-97, § 311, 79 Stat. 286, 381. The House Report stated that extending Social Security coverage to medical interns "would give young doctors an earlier start in building up social security protection and would help many of them to become insured under the program at the time when they need the family survivor and disability protection it provides." H.R. Rep. No. 89-213 (1965). The Report further states that

> The effect of this amendment is to extend [FICA coverage] to such interns unless their services are excluded under provisions other than section 3121(b)(13). Thus, the services of an intern are covered if he is employed by a hospital which is not exempt from income tax as an organization described in section 501(c)(3) of the code. If the intern is employed by a hospital which is exempt from income tax

18

and which has a waiver certificate in effect under section 3121(k) of the code, he is not excluded from coverage by section 3121(b)(3)(B) of the code if coverage was effected under such certificate.

*Id.*

According to the Government, the enactment of the intern exception—which reflects a determination that interns (and, *a fortiori*, residents) are ineligible for the student exception—combined with the repeal of the intern exception—which reflects a determination that interns (and, *a fortiori*, residents) should be covered by the FICA tax—demonstrate a congressional determination that medical residents are ineligible for the student exception. Thus, if we find the statute ambiguous and look to legislative history, the Government believes we will find the legislative history to require a ruling in its favor.

We disagree. The Government is correct in pointing out that traditional rules of construction, such as the *expressio unius* canon and the rule against surplusage, suggest that in 1939 and 1965, Congress did not believe that medical interns were categorically *eligible* for the student exception. But it does not follow that Congress considered medical residents to be categorically *ineligible* for that exception. *See Mount Sinai*, 486 F.3d at 1253 ("The student exemption relies, in part, on the identities of the employees and employers to define the scope of the exemption, whereas the intern exemption applied to a type of service. The intern exemption would have been superfluous only if an intern were always a 'student' and a 'hospital' were always a 'school, college, or university.' Although all interns may be students, not all hospitals are schools, colleges, or universities."). The statement from the House Report accompanying the repeal of the intern exception "leaves open the possibility that interns might qualify for other FICA exemptions." *Univ. of Chi. Hosp.*, 545 F.3d at 569. It states that "[t]he effect of this

19

amendment is to extend coverage under the Federal Insurance Contributions Act to such interns *unless their services are excluded under provisions other than* [*the intern exception*]." H.R. Rep. No. 89-213, 216 (1965) (emphasis added).

Congress has not defined the term "student" such that a post-graduate doctor could *never* be eligible for the exception. As the Eleventh Circuit held, "[t]he student exception was wholly unaffected by the repeal of the intern exception, and the repeal of the intern exception implied nothing about whether either interns or residents might bring themselves under the student exception." *Univ of Chi. Hosp.*, 545 F.3d 569. We will not infer from a sequence of legislative events occurring more than forty years ago that Congress intended today's medical residents to be categorically ineligible for the student exception.

As the Sixth Circuit noted in *St. Luke's*, the nature of medical residency has changed over time. Between 1939 and 1965, medical residents evolved from members of the hospital staff into trainees engaged in a prolonged course of study. The Hospitals claim that since then, residents have become students and medical centers have become schools. In support of that claim, they have introduced evidence that residency programs are accredited, that the programs have a strong educational component, and that residency is a prerequisite for medical licensure. Contrary to the Government's claims, which focus on the meaning of the statute and an unstated (and unenacted) congressional intent, these cases are really about the nature of modern residency programs and the relationships between residents and their hospitals. If those programs are now schools and if residents are now students, Congress's failure to anticipate that development does not bar the hospitals from now applying for such recognition.

20

## II. The Cancer Center's Scholarship Claim

In addition to the student exception, the Cancer Center also invokes the Scholarship regulation. The Cancer Center relies on regulations interpreting the general definition of "gross income" under the Tax Code, which provides, in relevant part, that an individual may exclude from the computation of gross income:

> any amount received by an individual as a scholarship or fellowship grant to the extent the individual establishes that, in accordance with the conditions of the grant, such amount was used for qualified tuition and related expenses.

26 U.S.C. § 117(b)(1). The statute further provides that the fellowship exemption shall not apply to "that portion of any amount received which represents payment for teaching, research, or other services by the student required as a condition for receiving the qualified scholarship or qualified tuition reduction." 26 U.S.C. § 117(c)(1). Treasury Department regulations provide that

> amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant . . . if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for [employment] services . . .. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefits to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant.

26 C.F.R. § 1.117-4(c)(2). The Supreme Court upheld a prior version of this regulation in *Bingler v. Johnson*, 394 U.S. 741 (1969), and in doing so it commented that the regulations were consistent with "the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial quid pro quo from the recipients." *Id.* at 751. In the years following *Bingler*, "the numerous courts that have

21

considered various aspects of this issue have almost uniformly held that payments made to medical residents do not qualify for the § 117 exclusion." *Field v. Comm'r*, 680 F.2d 510, 513 (7th Cir. 1982) (collecting cases).

In addition to the statute and regulation, the IRS has also ruled in Notice 87-31 that "the application of FICA or FUTA depends on the nature of the employment and the status of the organization." IRS Notice 87-31, 1987-1 C.B. 475. Furthermore, "[w]here a portion of a scholarship is granted in return for services . . . the grantor must make a good faith allocation, based on all the facts and circumstances, to determine that portion of the amount that represents compensation for services provided by the recipient." *Id.* "Only those amounts allocated to compensation for services provided by the recipient are subject to the reporting and withholding requirements described in this paragraph."

In support of its motion for summary judgment, the Government focused on whether the residents received the funds as a scholarship, arguing that they did not because their receipt of the funds is conditioned on the requirement that the residents provide patient care services. For support, it relied on the appointment letter that the Cancer Center sent to residents when they were chosen for the residency program. The letter describes the residents' responsibilities as follows:

> It is expected as a member of the graduate staff of Memorial Hospital for Cancer and Allied Diseases you will develop a personal program of self-study and professional growth with guidance from teaching staff of the Hospital; *participate in safe, effective and compassionate patient care under supervision as determined by the Chief of Service or his/her designee commensurate with your level of advancement and responsibility*; participate fully in the educational activities of your program and, as required, assume responsibility for teaching and supervising other residents and students; participate in the evaluation of the quality of education provided by the Program; participate in institutional programs and activities involving the Hospital medical staff and institutional committees

22

and councils, especially those that relate to quality assurance and patient care review activities; apply cost containment measures in the provision of patient care; and adhere to the rules and regulations, Bylaws, and policy and procedures of the institution. Memorial Hospital for Cancer and Allied Diseases agrees to provide a suitable environment for medical education and training in accordance with established standards.

Appendix at A-228, *United States v. Mem'l Sloan-Kettering Cancer Ctr.*, No. 07-0926-cv (2d Cir. May 23, 2007) (emphasis added).

Based on this language, the Government contended that the entirety of the monies paid to residents are given conditionally and that the Cancer Center's residents receive none of their funds unless they provide patient care services. In response to the Hospitals' assertion that the residents care for patients solely in order to learn how to practice medicine, the Government pointed out that many professionals learn their profession through on-the-job training. The Cancer Center disagreed with this characterization of the services that residents provide. It argued that "[i]n the agreement it doesn't say patient care services, it says experience[] patient care, much like they have to experience grand rounds, much like they have to experience everything else in the agreement." The district court agreed with the Government, finding that "the argument is overpowering that . . . the payments qualify in whole for FICA treatment."

We find no error in the district court's ruling on this point. Any reasonable fact finder reading the appointment letter would understand it to require that residents provide patient care services as a condition of receiving funds from the Cancer Center. The Cancer Center does not seriously dispute that residents must provide patient care. It emphasizes that the purpose of requiring that the resident provide that care is educational. Nonetheless, we agree with the Government that the educational purpose of the service requirement does not change the way in which the requirement exacts a "substantial quid pro quo" from the residents, and cannot be

characterized as a "relatively disinterested, 'no strings'" arrangement. *Bingler*, 394 U.S. at 749-50. Although the Cancer Center argues that the district court should have inquired into which portion of the residents' compensation was conditioned on patient care and which part was not, the agreement between the resident and the Cancer Center does not separate the compensation amount into two groups, those that are conditional and those that are not. The agreement imposes the patient care requirement as a condition on the resident's status as a resident, and thus as a condition on the entirety of the compensation provided therefor. And because it appears that the Cancer Center's "resident education and patient care services are inextricably intertwined" "it is unclear if any allocation would be possible." *United States v. Partners Healthcare Sys., Inc.*, Civ. No. 05-11576, 2006 WL 6087284, at *7-8 (D. Mass. Sept. 30, 2008). The district court properly refused to engage in a further inquiry into which portion was conditional.

### III.  Conclusion

We VACATE the judgments of both district courts insofar as they ruled that medical residents are ineligible for the student exception as a matter of law. We AFFIRM the judgment of the United States District Court for the Southern District of New York insofar as it ruled that the monies paid by the Cancer Center to its medical residents are not scholarships. We REMAND both cases for further proceedings consistent with this opinion.

TRAGER, District Judge, concurring in part and dissenting in part:

Although I agree that payments made to residents cannot qualify as scholarships, I respectfully dissent from the panel's construction of the student exception from FICA taxes. My colleagues find that the text of 26 U.S.C. § 3121(b)(10) unambiguously adopts a case-by-case approach for determining whether a medical resident qualifies for the student exception. Unlike my colleagues, I find the statutory text ambiguous and resort to legislative history appropriate. And here Congress unambiguously expressed its intent that residents are categorically ineligible for the student exception when it repealed the related FICA tax exception for interns in 1965 (the "intern exception" and the "1965 amendment").[1] Indeed, between the 1965 amendment and the Eighth Circuit's decision in Minnesota v. Apfel, 151 F.3d 742 (8th Cir. 1998), a period of almost 33 years, Congress's intent to make residents categorically ineligible for the student exception appears to have been clearly understood by all relevant parties.

26 U.S.C. § 3121(b)(10) - which defines the student exception - uses extremely general language. The relevant portion exempts from FICA taxation any remuneration for a "service performed in the employ of ... a school, college, or university ... if such service is performed by a

---

[1]Moreover, even accepting the claim that the statutory language was unambiguous, the chronology or contextual history of the repeal of the intern exception and its relationship to the student exception, apart from any other sources of legislative history, would be decisive for me. However, I find it unnecessary to rely on this principle in view of its unresolved and contested status. Compare Cohen, 498 F.3d at 116 ("if [the statutory text] is unambiguous, no further inquiry is necessary.") with United States v. Turkette, 452 U.S. 576, 580 (1981) ("If the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.") (emphasis added, quotation omitted) and United Steelworkers of America v. Weber, 443 U.S. 193, 201 (1979) ("In this context respondent's reliance upon a literal construction . . . is misplaced. It is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers.") (quotation omitted).

25

student who is enrolled and regularly attending classes at such school, college, or university . . . ." 26 U.S.C. § 3121(b)(10). The text is ambiguous in that it does not clearly define either the term "student" or the term "school, college, or university." The fact that the statute uses terms that are plain and simple at first glance does not make it unambiguous. Instead, we must focus on the specific question before the court and determine whether the text, standing alone, allows for more than one reasonable interpretation. Whether a statute is ambiguous depends on whether it has an "unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997). To be unambiguous, a statute must supply "rule of decision fine-grained enough so that it controls the 'precise question' at issue . . . ." General Elec. Co. v. Comm'r of Internal Revenue, 245 F.3d 149, 154 (2d Cir. 2001) (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n.9 (1984)).

The question directly posed by the parties is whether medical residents are categorically ineligible for the student exception or whether eligibility should be judged on a case-by-case basis. This question requires us to determine not merely how the statute treats residents but also at what level of generality eligibility for the exception is decided. Conceptually, at least, the statute could judge putative students (1) categorically, such that all residents are treated alike; (2) by program, such that all residents in a particular program are treated alike; or (3) as individuals, such that two individuals in the same program might receive different treatment depending on their individual circumstances.

The bare text of the statute does not unambiguously resolve the matter. The text itself says little about at what level of generality eligibility should be determined. It is so spare that it

does not even enumerate the criteria to use in determining whether a person is a "student" or what institutions can be called a "school, college, or university," let alone specify at what level of generality this decision is to be made. See 26 U.S.C. § 3121(b)(10). As the majority notes, the statute does provide some guidance in that it specifies that only students who are "regularly attending classes" may qualify and that they must work for a "school, college, or university . . . ." Maj. Op. at 16. But the fact that the statute provides some limited guidance as to who qualifies is not the same thing as specifying at what level of generality the definition is to be applied.

Nor does logic provide an obvious gloss on the language that eliminates the ambiguity. Considering the case of residents, on the one hand, a case-by-case resolution make sense as residency programs likely vary in their nature. On the other hand, categorically resolving the matter in favor of ineligibility might also make sense because all residents have earned their medical degrees before commencing their residencies and all have patient care responsibilities that are substantial, to say the least. Moreover, a categorical resolution would ensure equity among residents. As noted above, to qualify for the student exception, an individual must work for a "school, college, or university . . . ." 26 U.S.C. § 3121(b)(10). A case-by-case resolution might therefore grant an exception to a resident who happened to work for a hospital that is part of a university or medical school but deny it to one who happened to work for a standalone hospital - despite the fact that the two programs were similar in all other relevant respects. A categorical resolution, however, would treat them equally.

Policy considerations also don't furnish a clear answer. On the one hand, a case-by-case approach might maximize fairness in particular situations. On the other hand, a categorical approach might reduce administrative costs and provide certainty. See United States of America

v. Mount Sinai Medical Center of Florida, 353 F. Supp. 2d 1217, 1229-30 (S.D. Fla. 2005) (arguing that it would be a waste of resources to litigate student exception claims by residents because of the huge volume of cases and their highly repetitive facts), rev'd, 486 F.3d 1248 (11th Cir. 2007). Given the presence of plausible arguments for different interpretations, the text could reasonably be interpreted in more than one fashion. Because of the ambiguity of the bare text, resort to legislative history is proper to determine Congress's intent. Cohen v. JP Morgan Chase & Co., 498 F.3d 111, 116 (2d Cir. 2007).

Here, legislative history eliminates any ambiguity left by the bare text, making it clear beyond any "reasonable doubt" that Congress intended that residents would be subject to FICA taxation. Cohen, 498 F.3d at 122 (quotation omitted). By "legislative history," I do not mean merely committee reports and floor statements. As has often been noted, these are not always an ideal guide to congressional intent. See, e.g., Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 620-22 (1991) (Scalia, J., concurring). Rather, my view is based principally on the contextual history of laws that Congress passed regarding FICA tax exemptions. This sequence of laws so clearly revealed Congress's purpose that, for more than three decades after the 1965 amendment, all the relevant parties appear to have understood that residents were categorically ineligible for the student exception. See Albany Medical Center, 2007 WL 119415, at *1 n.1.

Stated more specifically, the legislative history directly indicates that interns are subject to FICA taxation and the coverage of residents under the FICA tax regime follows inexorably from the coverage of interns. In 1939, Congress passed two relevant exemptions to FICA taxation: the original version of the student exception and the intern exception. Social Security Act Amendments of 1939, Pub. L. No. 76-379, ch. 666, 53 Stat. 1385 (1939). In the years

28

leading up to 1964, a growing number of medical residents claimed that they should be exempt from FICA taxation under the intern exception because the functional distinctions between interns and residents had eroded. The Sixth Circuit rejected this argument, holding that any expansion of the intern exception was for Congress, not the courts to create. St. Luke's Hosp. Assoc. v. United States, 333 F.2d 157, 164 (6th Cir. 1964). In 1965 - rather than expand the intern exception to cover residents - Congress instead chose to eliminate the intern exception entirely. Social Security Act Amendments of 1965, Pub. L. No. 89-97 § 311, 79 Stat. 380-81 (1965).

The House and Senate reports, though not essential to determining congressional intent, are nonetheless worth reviewing. The House Report for the 1965 amendment repealing the intern exception indicated that:

> Coverage would also be extended to services performed by medical . . . interns. The coverage of services as an intern would give young doctors an earlier start in building up social security protection and would help many of them to become insured under the program at a time when they need the family survivor and disability protection it provides. This protection is important for doctors of medicine who, like members of other professions, in the early years of their practice, may not otherwise have the means to provide adequate survivorship and disability protection for themselves and their families

Social Security Amendments of 1965, H.R. Rep. No. 89-213, 89th Cong. 1st Sess. 95, reprinted in 1965-2 C.B. 733, 735 (1965). Similarly, the Senate report for the bill repealing the intern exception noted that "[c]overage would also be extended to services performed by medical . . . interns." Social Security Amendments of 1965, S. Rep. No. 89-404 (1965), reprinted in 1965-2 C.B. 758, 759 (1965).

Taken together, the contextual history and legislative purpose establish Congress's clear intent to cover residents under the FICA regime. See Albany Medical Center v. United States,

29

No. 1:04-CV-1399 (FJS/RFT), 2007 WL 119415, at *2-5 (N.D.N.Y. Jan. 10, 2007) (discussing the legislative history of the student exception somewhat more fully). The fact that Congress passed both the intern exception and the student exception at the same time suggests that Congress did not intend interns to fall under the student exception. Moreover, the fact that Congress repealed the exception for interns in 1965 indicates that Congress intended for interns to be subject to FICA taxes. The repeal of the intern exception is sufficient on its own to demonstrate this intent to secure coverage and the House and Senate reports indicating that interns are covered adds further confirmation.

If Congress intended to include interns in the FICA tax regime in 1965, that same intent extends to the coverage of residents. The distinction between interns and residents which the St. Luke's opinion found blurred in 1964 has further eroded since the 1965 amendment; but residents are at least as far removed from medical school as those known as interns in 1965.[2] Therefore, if interns categorically are not covered, neither are residents. At a more general level, Congress's objective in repealing the intern exception in 1965 is clear: to secure social insurance coverage for doctors who are early in their careers. The repeal of the intern exception in 1965 cannot have meant anything else and the language of the House Report noting Congress's objective to ensure coverage for "young doctors" underscores this point. See Social Security Amendments of 1965, H.R. Rep. No. 89-213, 89th Cong. 1st Sess. 95, reprinted in 1965-2 C.B. 733, 735 (1965). Allowing residents to apply for the student exception would thwart Congress's clear objective of ensuring that young doctors receive the social insurance coverage funded by FICA. Indeed, to ignore this historical context is to say that Congress engaged in a fruitless act when it repealed

_____

[2]See the discussion in Albany Medical Center, 2007 WL 119415, at *3 n.2.

30

the exemptions for medical interns in 1965, although no one appears to have thought so until inventive lawyering discovered § 3121(b)(10) some thirty years later.[3]

Nor should we be concerned that Congress's intent might be different today from what it was in 1965 in light of the evolving development of resident programs.  This is a matter on which Congress should speak if it wishes to alter its previously stated and unequivocal goal of providing coverage for young doctors and their families.  Moreover, in these difficult times, while one can appreciate the financial pressures hospitals face and their desire to reduce costs, there are substantial policy issues of equity among residents and between and among hospitals that Congress is the body to consider before courts adopt a case-by-case approach as urged by appellants here.  I am aware that other circuit courts have reached a different conclusion and I do not take their decisions lightly.  However, Congress has spoken directly to the issue at hand.

The majority alternatively relies on regulations which the Treasury Department issued regarding the application of the student exception.  This argument must be addressed under the under the framework of Chevron.  See McNamee v. Dep't. of the Treasury, 488 F.3d 100, 105 (2d Cir. 2007) (applying Chevron to a treasury regulation and provisions of the Internal Revenue Code).[4]  The result would be the same.  The Chevron framework has two steps.  "First, always, is

---

[3]The current wave of litigation regarding residents' exemption was apparently touched off by the Eighth Circuit's decision in Apfel.  See  Albany Medical Center, 2007 WL 119415, at *1 n.1.

[4]There is some controversy over whether Treasury Regulations are analyzed under Chevron deference or under the standard elucidated by the Supreme Court in National Muffler Dealers Ass'n, Inc. v. United States, 440 U.S. 472, 477 (1979).  See Swallows Holding, Ltd. v. Comm'r of Internal Revenue., 515 F.3d 162, 167 (3d Cir. 2008).  The better view is that Treasury Regulations are analyzed under Chevron.  See McNamee, 488 F.3d at 105 (applying Chevron); Cinema '84 v. Comm'r of Internal Revenue., 294 F.3d 432, 439 (2002) (applying Chevron); see also Swallows, 515 F.3d at 168 n.6 (discussing McNamee).  Despite this, the Second Circuit has

31

the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter . . . ." Chevron, 467 U.S. at 842. Second, "[i]f ... the court determines Congress has not directly addressed the precise question at issue, .... the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843.

At step one of the Chevron framework, the court must initially focus on the language of the statute to determine whether Congress has directly spoken to the question at issue. Cohen, 498 F.3d at 116. A court may consider the context of the statute as a whole in determining whether a given provision is ambiguous. FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000). If the text of the statute is unambiguous with respect to that issue, then the matter is settled. Cohen, 498 F.3d at 116. Should the text prove to be ambiguous, the preponderance of authority indicates that legislative history may be considered at step one of the Chevron framework - before turning to the regulations. The Second Circuit did precisely this in

---

expressed uncertainty over the question of which standard governs as recently as 2001. General Elec. Co. v. Comm'r of Internal Revenue, 245 F.3d 149, 154 n.8 (2d Cir. 2001). Moreover, McNamee cites - but does not apply - both National Muffler and Cottage Sav. Ass'n v. Comm'r of Internal Revenue, 499 U.S. 554, 560 (1991), a tax case that relies on National Muffler. See McNamee, 488 F.3d at 106.

It is worth noting, however, that the result would be the same whether Chevron or National Muffler is applied. National Muffler does not explicitly have the same two step structure as Chevron; rather National Muffler dictates deference when the regulation "implement[s] the congressional mandate in some reasonable manner" and focuses on a list of specific factors. National Muffler, 440 U.S. 472, 476-77 (1979) (quotation omitted). Unsurprisingly, therefore, analysis under National Muffler is also sensitive to legislative history. See Allen Oil Co., Inc. v. Comm'r of Internal Revenue, 614 F.2d 336, 339, 340-41 (2d Cir. 1980). In view of the clear inference from the chronology and purpose of the student exception, no regulation allowing residents to apply for the student exception could stand under National Muffler. Moreover, as discussed more fully below, the relevant regulation does not even clearly allow such applications. See 26 C.F.R. § 31.3121(b)(10)-2 (2003).

Cohen.  Id. at 122-25.  Indeed, the language of Chevron implies an inquiry at step one that reaches beyond the bare text of the statute.  It describes the purpose of step one as being to determine "the intent of Congress . . . ."  Chevron, 467 U.S. at 842 (emphasis added).  It is therefore unsurprising that the Supreme Court has recently and frequently considered legislative history at step one of Chevron.  See Gen. Dynamics Land Sys. v. Cline, 540 U.S. 581, 587-90, 600 (2004); Brown, 529 U.S. at 133, 147-48, 150, 154-57; Pension Ben. Guar. Corp. v. LTV Corp., 496 U.S. 633, 649-50 (1990).[5]  Accordingly, if, as I believe, the bare text is ambiguous

---

[5]In Gen. Dynamics, the Court extensively considered legislative history before concluding that the Age Discrimination Employment Act clearly did not prohibit discrimination in favor of older workers.  450 U.S. at 587-90, 600.  The Court held that, even if the agency's interpretation would otherwise have been eligible for deference under Chevron, the clarity of the statute meant that such deference did not apply.  Id. at 600.  In Brown & Williamson, the Court considered whether the Food, Drug and Cosmetic Act ("FDCA") allowed the Food and Drug Administration to regulate cigarettes.  At Chevron step one, the Court considered acts passed subsequent to the FDCA, proposed legislation that was not passed and statements made by agencies, officials and legislators at the time that relevant legislation was being considered.  Brown & Williamson, 529 U.S. at 133-57.  In so doing, the Court blended a consideration of the statutory scheme as a whole with a consideration of legislative history.  See id.  In LTV Corp., the Court considered legislative history at Chevron step one but found that it did not clearly indicate congressional intent.  LTV Corp., 496 U.S. at 649-50.  To be sure, the Supreme Court has not always considered legislative history at Chevron step one - though it does not appear that the Court has ever explicitly ruled out such consideration.  See, e.g., National Cable & Telecommunications Ass'n v. Brand X Internet Services, 545 U.S. 967, 986 (2005); National R.R. Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407, 417-18 (1992); but see K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 293 n.4 (1988) (opinion of Kennedy, J.) (writing only for himself and Justice White and stating that, for purposes of resolving a statutory textual ambiguity prior to turning to agency regulations, "any reference to legislative history, is in the first instance irrelevant.").

The Second Circuit considered legislative history at Chevron step one in Cohen.  498 F.3d at 122-24.  However, there are some Second Circuit cases predating Cohen which express uncertainty regarding whether legislative history may be considered at step one.  See, e.g., Sash v. Zenk, 428 F.3d 132, 137-38 (2d Cir. 2005); Coke v. Long Island Care At Home, Ltd., 376 F.3d 118, 127 & n. 3 (2d Cir. 2004), rev'd on other grounds 127 S.Ct. 2339, 2347-49 (2007); see also United States v. Geiser, 527 F.3d 288, 292 (3d Cir. 2008) (holding that legislative history may not be considered at Chevron step one).  Nonetheless, in view of the Second Circuit's recent decision in Cohen and the Supreme Court's practice in Gen. Dynamics, Brown & Williamson and LTV Corp., such consideration seems proper in this case, particularly because the legislative

33

and the legislative history is conclusive, consideration of the relevant regulations is unnecessary

and step two of the Chevron framework is never reached, cf. Chevron, 467 U.S. at 842-43;

Cohen, 498 F.3d at 116, although the regulations in effect at the time would but have added only

another layer of ambiguity.[6]

For the foregoing reasons, I respectfully concur in part and dissent in part.

---

history clearly establishes that Congress spoke the issue at hand for the reasons discussed above.

[6]The significant portions of the relevant regulations are closely patterned on the statutory text. See 26 C.F.R. § 31.3121(b)(10)-2 (2003). Though the regulation contains additional language, it does not resolve the issue presented here. For example, the regulation notes that "[t]he term 'school, college, or university' ... is to be taken in its commonly or generally accepted sense." 26 C.F.R. § 31.3121(b)(10)-2(d) (2003). Thus, the regulation's language adds little to the discussion. In addition the regulation notes that, to determine whether an individual is a student, one must examine the "basis of the relationship of such employee with the [school]" and that an individual is considered a student when they "perform[] services ... as an incident to and for the purpose of pursuing a course of study...." 26 C.F.R. § 31.3121(b)(10)-2(c) (2003). These elements defining the term "student" could as easily be applied on a categorical basis, a program-by-program basis or an individual basis. None of these three interpretations would be unreasonable and therefore the regulation does not resolve the ambiguity.

    Even if the regulation were clear, the historical context discussed above would, in my view, lead to the same result. Given the clarity of Congress's intent, no regulation allowing residents to apply for FICA coverage would qualify as a permissible interpretation of the statute. See Texas v. United States, 497 F.3d 491, 506 (5th Cir. 2007) (finding, in the alternative, that even if a regulation could survive Chevron step one, it was unreasonable in light of congressional intent).