USMAN BHUTTA, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 26940–13.        Filed December 22, 2015.

P, a citizen of Pakistan and a foreign medical school grad-
uate, entered the United States in 2009 to participate in an
internal medicine residency training program. During the
three-year residency training program, for which P received
an annual salary, P treated patients, with supervision; con-
ducted and presented research; and supervised and trained
third- and fourth-year medical students. P's supervising and
training of medical students consisted of having the medical
students observe him during "rounds", preparing the students
for monthly examinations, and evaluating the students
monthly. For taxable year 2010 P reported his wages from the
residency training program as exempt from U.S. income tax
under the Convention for the Avoidance of Double Taxation
and the Prevention of Fiscal Evasion With Respect to Taxes
on Income, U.S.-Pak., art. XII, July 1, 1957, 10 U.S.T. 984

(entered into force May 21, 1959) (hereinafter treaty). Treaty art. XII exempts from U.S. income tax remuneration that a professor or teacher receives for teaching if the professor or teacher is a Pakistani resident who temporarily visits the United States "for the purpose of teaching for a period not exceeding two years at a university, college, school or other educational institution" in the United States. R subsequently issued P a notice of deficiency disallowing the claimed treaty exemption. P asserts that he is entitled to an exemption under treaty art. XII or, alternatively, that he is entitled to an exemption under treaty art. XIII(3). Treaty art. XIII(3) exempts from income tax compensation up to $10,000 if a Pakistani resident, temporarily present in the United States under arrangements with the United States or any agency or instrumentality thereof solely for the purpose of training, study, or orientation, receives such compensation for the rendition of services directly related to such training, study, or orientation. *Held*: P was not in the United States for "the purpose of teaching" in 2010 and therefore is not entitled to the exemption under treaty art. XII. *Held*, *further*, P is not entitled to the exemption under treaty art. XIII(3) because P has not proven that he was in the United States under arrangements with the United States or an agency or instrumentality thereof. *Held*, *further*, R's determination is sustained.

*H. Craig Pitts*, for petitioner.

*William Franklin Castor* and *H. Elizabeth H. Downs*, for respondent.

MARVEL, *Judge*: In a notice of deficiency, respondent determined a $4,415 deficiency in petitioner's Federal income tax for taxable year 2010. Petitioner timely petitioned this Court for redetermination of the deficiency. After concessions,[1] the sole issue for decision is whether petitioner's wages earned as a medical resident in 2010 are exempt from tax under

---

[1] Respondent conceded his determination in the notice of deficiency that petitioner had a taxable State tax refund of $762. This concession resulted in a computational adjustment to petitioner's itemized deductions, and in a first supplemental stipulation of facts the parties stipulated respondent's computation of a reduced deficiency of $4,295. In addition to the explicit concessions, we consider petitioner to have conceded his assertion in the petition that he is entitled to a standard deduction for 2010. Petitioner failed to advance any arguments as to this issue in his opening or answering brief. Accordingly, we deem the issue abandoned. *See Wilcox v. Commissioner*, 848 F.2d 1007, 1008 n.2 (9th Cir. 1988), *aff'g* T.C. Memo. 1987–225; *Lunsford v. Commissioner*, 117 T.C. 183, 187 (2001); *Nicklaus v. Commissioner*, 117 T.C. 117, 120 n.4 (2001).

article XII or article XIII(3) of the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, U.S.-Pak., July 1, 1957, 10 U.S.T. 984 (entered into force May 21, 1959) (United States-Pakistan Income Tax Convention or treaty).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts are incorporated herein by this reference. Petitioner resided in Oklahoma when he petitioned this Court. [2]

Petitioner was a citizen of Pakistan at all relevant times. At the time of trial he lived with his wife, a Pakistani citizen whom he married in 2010, and his daughter, who is a U.S. citizen. He has been a practicing physician on the nephrology faculty of OU Physicians, a physicians group within the Oklahoma University Health Sciences Center (university), since August 2014 after completing a three-year residency training program and a fellowship there.

## I. *Petitioner's Medical Background and Residency Training Program*

In 2005 petitioner graduated from Allama Iqbal Medical College, University of Punjab, Lahore, Pakistan, with a medical degree. To obtain the medical degree petitioner completed five to six years of coursework and spent one year working in a hospital. [3]

Petitioner believed that the medical training in the United States was "far superior" to the training he received in Paki-

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3] It is not clear whether petitioner practiced medicine in Pakistan before entering the United States in 2009. During cross-examination petitioner answered "Yes. After I did the one year training" to respondent's counsel's question "At the point you graduated from medical school, did you become a medical doctor for purposes of Pakistan?" However, petitioner stated on an unsigned Form 9250, Questionnaire—Tax Treaty Benefits, *see infra* p. 358, that his occupation before coming to the United States was "medical student". The record does not show where petitioner was employed after obtaining the medical degree in 2005 and before entering the United States in 2009. However, we infer from the record that petitioner did not teach at a medical school in Pakistan.

stan and decided to pursue a medical residency in the United States. Before he could begin a residency training program in the United States, however, petitioner had to pass the United States Medical Licensing Examination (USMLE), a three-step examination for medical licensure in the United States. He completed the first step and the clinical knowledge portion of the second step in Pakistan on December 20, 2006, and October 18, 2007, respectively. On December 4, 2007, petitioner was issued a B–1/B–2 visa, which allowed him to enter the United States to take the clinical skills portion of the second step of the USMLE. Petitioner completed the clinical skills portion in the United States on January 30, 2008.

After passing steps 1 and 2 of the USMLE, petitioner was eligible for certification from the Educational Commission for Foreign Medical Graduates (ECFMG). ECFMG is an organization that certifies the qualifications of international medical school graduates before they begin U.S. graduate medical education. ECFMG certification is required before an international medical school graduate may take step 3 of the USMLE, begin a U.S. residency training program, and obtain an unrestricted license to practice medicine in the United States. Petitioner obtained ECFMG certification on March 27, 2008, and he completed the third step of the USMLE in the United States in January 2009.

While in the United States petitioner interviewed at various universities seeking acceptance into an internal medicine residency training program. He interviewed with the university and received by letter dated March 23, 2009, an offer of appointment as a first-year internal medicine resident from the university's department of internal medicine. The offer letter indicated that petitioner's start date would be July 1, 2009, and that he would complete his "residency training" on June 30, 2012. The letter also stated that petitioner would have the opportunity to initiate training in a subspeciality during his second year of residency. The residency position paid an annual salary of $45,666 for the first year, which increased by approximately $1,000 "with each year of training." Petitioner accepted the offer by signing the letter on March 28, 2009, and returning it to the university.

Petitioner's acceptance of the university's offer was memorialized in a contract entitled the University of Okla-

homa College of Medicine Residency Agreement, which petitioner and a university representative signed on August 11, 2009 (2009 agreement). The 2009 agreement covers only petitioner's first year of residency and comprises four parts: Appointment; University Responsibilities; Resident Responsibilities; and Reappointment, Promotion, and Termination. Among the university's stated responsibilities is its obligation to provide a "graduate medical education program" with "faculty oversight and supervision of all educational and clinical activities". Resident responsibilities include "fulfill[ing] the educational requirements of the training program" and using "his/her best efforts to provide safe, effective and compassionate patient care". Teaching medical students is not a stated resident responsibility.

Under the 2009 agreement a resident could be suspended without pay or dismissed for failing to obtain an Oklahoma medical license within a prescribed time. The 2009 agreement also states that continuation of the training program requires annual renewals of appointment, which are not automatically offered but rather are "offered yearly based upon meeting the performance standards of the Program." Failure to satisfactorily complete training program requirements or breaching institutional rules could result in "nonpromotion". A resident would not know for certain whether he could continue in the program until the university gave him a renewal contract.[4]

Before he could begin his residency training program, petitioner needed to obtain a U.S. exchange visitor, or J–1, visa. ECFMG, as petitioner's sponsor, issued him a Form DS–2019, Certificate of Eligibility for Exchange Visitor (J–1) Status, which allowed him to go to a U.S. embassy to apply for and receive the visa. *See* 22 C.F.R. sec. 62.2 (2010) (defining Form DS–2019). The Form DS–2019 described petitioner as a "university post grad medical trainee", an "alien physician", and a "research scholar" and was valid from August 10, 2009, to August 9, 2010, to reflect the dates of the 2009 agreement.[5]

---

[4] Petitioner was aware of other residents at the university whose contracts were not renewed.

[5] Originally the Form DS–2019 was valid beginning July 2009, but because there was a delay in the issuing of petitioner's visa, which caused

Continued

ECFMG had to renew the Form DS–2019 every year for petitioner to continue in the residency training program. ECFMG's criteria for renewing a Form DS–2019 were listed on its Web site and included a requirement that an applicant provide proof of a renewed agreement with a university, a letter of good standing from the director of the applicant's residency training program, and copies of the applicant's visa and insurance. ECFMG would not renew a Form DS–2019 if the applicant's residency training program or university closed or if the applicant's home country wanted him to return.

Petitioner obtained a J–1 visa on June 5, 2009. The J–1 visa allowed petitioner to remain in the United States for the duration of the residency training program and any postresidency fellowship but required him to return to Pakistan for two years after his training unless he obtained a hardship waiver. *See id.* sec. 62.27(g)(1). Petitioner entered the United States at the end of July 2009 and began his residency training program at the university on August 10, 2009. The university renewed petitioner's residency agreement yearly, allowing him to obtain a new Form DS–2019 every year and to complete his three-year residency training program on August 10, 2012. He then began a two-year fellowship in nephrology at the university, which he completed in August 2014. He subsequently obtained a hardship waiver of the J–1 visa two-year foreign residence requirement, which allowed him to remain in the United States and work at the university hospital as a licensed physician.

Petitioner's duties throughout his residency and fellowship included treating patients on inpatient wards and in the outpatient clinic under faculty supervision, conducting and presenting clinical research, and supervising and training third- and fourth-year medical students. All of these duties, including the supervising and training of medical students, were part of petitioner's training in the residency training program. Petitioner was able to treat patients and train the medical students simultaneously because, at that point in the medical students' education, they spent most of their time in the hospital on the ward teams with the residents.

---

a delay of his start date in the residency training program, ECFMG had to issue him a new Form DS–2019.

Three to five medical students accompanied petitioner on "rounds" during which he treated patients, and he discussed the patients' physical examination findings and other relevant information with the students. After rounds the medical students accompanied petitioner while he treated incoming patients or existing patients who needed additional care. After petitioner had finished treating his patients, he helped the students prepare for their monthly examinations. At the end of the month petitioner evaluated each student on certain criteria including medical knowledge, interpersonal communication skills, and ability to gather information and conduct physical examinations.

As discussed further *infra*, petitioner came to the United States in 2009 and remained in the United States in 2010 for the purpose of participating in a training program for medical residents. Although supervising and training medical students was a component of the residency training program, petitioner was not in the United States for the purpose of teaching.

The university also expected petitioner to conduct research as part of his residency training program. Petitioner spent one to two months per year on research, during which time he took on lighter clinical responsibilities so that he could conduct clinical research on selected patients. He conducted research during 2009 through 2011, published abstracts and articles, and presented his research at local and national medical conferences, such as the American Society of Clinical Oncology annual meeting and the national meeting of the American College of Physicians.[6]

## II. *Petitioner's 2010 Federal Income Tax Return and Liability*

Petitioner hired a tax return preparer in New York to prepare a Form 1040NR, U.S. Nonresident Alien Income Tax Return, on his behalf for taxable year 2010.[7] The return

---

[6] Petitioner estimated at trial that during 2010 his "education-related" activities, including research and teaching students, constituted 70% of a typical day. However, this percentage, even if accurate, is unconvincing as most of the time he spent supervising and training medical students was time spent treating patients as part of his residency training program.

[7] Although petitioner married in 2010, the return reflects a filing status of "other single nonresident alien". Respondent does not challenge peti-

Continued

states that petitioner's occupation in the United States is "research physician". The Form 1040NR does not report petitioner's wages from the residency totaling $46,170 as taxable income but rather claims the wages as "income exempt by a treaty". A Schedule OI, Other Information, attached to the return shows that petitioner claimed an exemption from income tax on his wages under treaty art. XII. Petitioner did not report or pay tax on his 2010 wages to Pakistan.

On November 19, 2012, petitioner filed a Form 9210, Alien Status Questionnaire, with respect to taxable years 2010–12. In response to the question regarding his reason for coming to the United States, petitioner checked the boxes for "Education" and "Teaching". An unsigned Form 9250 was attached to the Form 9210. On the Form 9250 petitioner indicated that his primary purpose in visiting the United States was "teaching/research/training in internal medicine". On the Form 9250 petitioner also stated that he came to the United States at the invitation of an educational institution and spent 50% of his time teaching and 50% of his time researching. Petitioner also stated that his occupation before coming to the United States was "medical student" and his occupation when he returned to Pakistan would be "consultant physician in nephrology".

Respondent mailed petitioner a notice of deficiency, dated November 5, 2013, disallowing petitioner's claimed exemption from U.S. income tax under treaty art. XII but allowing a $5,000 student exemption under treaty art. XIII(1)(a).[8]

---

tioner's claimed filing status.

[8] The Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, U.S.-Pak., art. XIII(1), July 1, 1957, 10 U.S.T. 984 (entered into force May 21, 1959), provides:

A resident of one of the contracting States, who is temporarily present in the other contracting State solely

(a) as a student at a recognized university, college or school in such other State, or

(b) as the recipient of a grant, allowance or award for the primary purpose of study or research from a religious, charitable, scientific or educational organization of the former State

shall be exempted from tax by such other State (i) on all remittances from abroad for the purposes of his maintenance, education or training, and (ii) with respect to an amount not in excess of 5,000 United States dollars for any taxable year, representing compensation for personal

Petitioner filed a timely petition in this Court contesting respondent's determination.[9]

OPINION

I. *Burden of Proof*

As a general rule, a notice of deficiency is entitled to a presumption of correctness, and the taxpayer bears the burden of proving the Commissioner's deficiency determination incorrect. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Bronstein v. Commissioner*, 138 T.C. 382, 384 (2012). However, under section 7491(a), if the taxpayer produces credible evidence [10] with respect to any factual issue relevant to ascertaining the taxpayer's liability for tax and meets other requirements, the burden of proof rests on the Commissioner as to that factual issue. *See Higbee v. Commissioner*, 116 T.C. 438, 440–441 (2001). With the exception of part III.B, *infra*, our findings of fact are based on a preponderance of the evidence, and thus the allocation of the burden of proof is immaterial. *See Estate of Bongard v. Commissioner*, 124 T.C. 95, 111 (2005). With respect to part III.B, *infra*, petitioner does not argue, and the record does not permit us to conclude, that the burden of proof should shift under section 7491(a), and the burden of proof remains with petitioner.

II. *Governing Statutory Framework*

Under the general rule of section 871(b), a nonresident alien individual such as petitioner [11] who is engaged in a

---

services.

[9] Petitioner initially elected to have this case conducted under small tax case procedures. *See* sec. 7463(a). Before trial petitioner's counsel orally moved that the "S" designation be removed, and we granted the oral motion.

[10] "Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." *Higbee v. Commissioner*, 116 T.C. 438, 442 (2001) (quoting H.R. Conf. Rept. No. 105–599, at 240–241 (1998), 1998–3 C.B. 747, 994–995).

[11] A nonresident alien is a person who is neither a citizen nor a resident of the United States as defined in sec. 7701(b)(1)(A). *Id.* subpara. (B). Respondent conceded that petitioner was not a citizen or a resident of the

Continued

trade or business in the United States is subject to U.S. income tax on the individual's taxable income effectively connected with the conduct of that trade or business. Ordinarily, an individual who performs personal services within the United States at any time during the taxable year conducts a "trade or business within the United States". Sec. 864(b). Consequently, a nonresident alien who receives compensation for the performance of personal services in the United States has income effectively connected with the conduct of a trade or business in the United States and therefore has gross income under the Code. *See* sec. 1.864–4(c)(6)(ii), Income Tax Regs.; *see also* sec. 61(a)(1). However, under section 894(a), the Code is applied to any taxpayer with due regard to any treaty obligations of the United States that pertain to that taxpayer. An applicable treaty obligation can therefore alter an individual's income tax liability under the Code.

## III. *The United States-Pakistan Income Tax Convention*

The United States-Pakistan Income Tax Convention was signed on July 1, 1957, and was ratified by the President of the United States on November 6, 1958. It entered into force on May 21, 1959, and is effective for taxable years beginning on or after January 1, 1959. This case raises interpretation issues regarding treaty art. XII, which deals with the tax ramifications of remuneration paid to professors and teachers, and treaty art. XIII(3), which deals with the tax ramifications of compensation paid for certain services related to training, study, or orientation under arrangements with a State or any agency or instrumentality thereof.

When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used. *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 534 (1991); *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 179–180 (1982). The plain meaning of the language of a treaty controls unless its effect is contrary to the intent or expectations of the signatories. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 346 (2006) (citing 1 Restatement (Third) of Foreign Relations Law of the United States sec. 325(1) (1986)); *Sumitomo Shoji Am., Inc.*, 457 U.S. at 180; *Amaral v. Commissioner*, 90 T.C. 802, 812 (1988). Because treaties are contracts between sovereigns, we

United States in 2010.

construe them more liberally than private agreements to give effect to the signatories' intent. *See United States v. Stuart*, 489 U.S. 353, 365–366 (1989); *Air France v. Saks*, 470 U.S. 392, 396 (1985); *Factor v. Laubenheimer*, 290 U.S. 276, 293 (1933); *Estate of Silver v. Commissioner*, 120 T.C. 430, 434 (2003) (citing *Nw. Life Assurance Co. of Can. v. Commissioner*, 107 T.C. 363, 378–379 (1996)). Where appropriate, we may ascertain the meaning of a treaty with an eye toward the treaty's legislative history and the parties' negotiations, diplomatic correspondence, and practical construction they have adopted. *See Air France*, 470 U.S. at 396; *Factor*, 290 U.S. at 294–295; *Estate of Silver v. Commissioner*, 120 T.C. at 434; *Rust v. Commissioner*, 85 T.C. 284, 288–289 (1985). We also give weight to how the departments of the respective governments charged with negotiating and enforcing a treaty interpret that treaty. *See Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961); *Rust v. Commissioner*, 85 T.C. at 288.

A. *Article XII of the United States-Pakistan Income Tax Convention*

Treaty art. XII provides: "A professor or teacher, resident in one of the contracting States, who temporarily visits the other contracting State for the purpose of teaching for a period not exceeding two years at a university, college, school or other educational institution in the other contracting State, shall be exempted from tax by such other contracting State in respect of remuneration for such teaching." Petitioner contends that the compensation he received in 2010 for his residency training program is exempt from U.S. income tax under treaty art. XII because a purportedly large component of the residency training program was teaching third- and fourth-year medical students. Respondent counters that petitioner (1) was not in the United States for "the purpose of teaching" and (2) was not temporarily visiting the United States for "a period not exceeding two years".

The phrase "the purpose of teaching" is not defined in the treaty. Our analysis focuses on the meaning of the word "purpose" and on whether petitioner had the requisite purpose. Neither party has invited our attention to, and we have not found, any legislative history or documentary evidence of the negotiators' or signatories' intended meaning of the word

"purpose". [12] *See, e.g.*, S. Exec. Rept. No. 85–1 (1958), 1960–2 C.B. 906 (Committee on Foreign Relations report on the treaty); 104 Cong. Rec. 13238–13241 (1958) (Senate floor debate and action on the treaty); Treasury Department Technical Explanation of the 1957 U.S.-Pakistan income tax treaty (Technical Explanation), signed July 1, 1957, RIA Int'l Tax Treaty 7033. In the instance of an undefined treaty term, treaty art. II(2) provides: "[A]ny term not otherwise defined shall, unless the context otherwise requires, have the meaning which it has under the laws of that contracting State relating to the taxes which are the subject of the present Convention." "[P]urpose" is not defined in the Code in any way meaningful to this situation. We therefore "adopt the ordinary, contemporary understanding of * * * [this] word[] for purposes of our analysis." *See Eshel v. Commissioner*, 142 T.C. 197, 209 (2014).

Black's Law Dictionary defines "purpose" as "[a]n objective, goal, or end". Black's Law Dictionary 1356 (9th ed. 2009). Merriam-Webster's Collegiate Dictionary defines "purpose" as "something set up as an object or end to be attained", Merriam-Webster's Collegiate Dictionary 949 (10th ed. 1997), and Merriam-Webster's Online Dictionary defines it as "the reason why something is done or used: the aim or intention of something"; "the feeling of being determined to do or achieve something"; and "the aim or goal of a person: what a person is trying to do, become, etc.", Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/purpose (last visited Nov. 16, 2015).

---

[12] To support his position, petitioner relies upon several revenue rulings promulgated by the Commissioner which we address *infra*. But the Commissioner generally does not participate in the negotiation of tax treaties, and we do not interpret the revenue rulings as evidence of the negotiators' or signatories' intent. *See Crow v. Commissioner*, 85 T.C. 376, 389 (1985) ("A revenue ruling represents the view of the Commissioner, not the Treasury Department, and thus is generally only 'the contention of one of the parties to the litigation.'" (citation omitted) (quoting *Estate of Smead v. Commissioner*, 78 T.C. 43, 47 n.5 (1982))); *see also Xilinx, Inc. v. Commissioner*, 598 F.3d 1191, 1196 (9th Cir. 2010) ("A tax treaty is negotiated by the United States with the active participation of the Treasury."), *aff'g* 125 T.C. 37 (2005). *But cf. Rauenhorst v. Commissioner*, 119 T.C. 157, 171 (2002) (describing cases where we have treated revenue rulings as concessions by the Commissioner where the rulings were relevant to the disposition of the case).

We use these definitions, which focus on the object or goal to be attained, to guide our analysis.[13] In so doing, we recognize that the better indicator of an individual's purpose is his conduct and not the individual's self-serving representations regarding his purpose. We examine the entire record and consider all of the relevant facts and circumstances to discern petitioner's purpose in coming to the United States.

Before coming to the United States, petitioner obtained a medical degree in Pakistan. He believed the medical training in the United States was "far superior" to the training he received in Pakistan and, for that reason, decided to pursue a medical residency here. In furtherance of his stated goal of obtaining U.S. medical training, petitioner obtained a Form DS–2019 from ECFMG, which allowed him to apply for and receive a J–1 visa. The Form DS–2019, which we consider to be objective, credible evidence of petitioner's and ECFMG's understanding regarding the nature of petitioner's trip to the United States, describes petitioner as a "university post grad medical trainee", an "alien physician", and a "research scholar".[14] Although both "teacher" and "professor" are pos-

---

[13] Petitioner cites Rev. Rul. 55–211, 1955–1 C.B. 676, to support his position. We address petitioner's contentions *infra* but for now note that Rev. Rul. 55–211, *supra*, the subject of which is the income tax treaty between the United States and the United Kingdom of Great Britain and Northern Ireland, interprets the phrase "the purpose" in a nearly identical context to mean "the primary purpose". *Id.*, 1955–1 C.B. at 677. We neither endorse nor reject that interpretation because we find that petitioner's only purpose in coming to and remaining in the United States in 2010 was to receive medical training.

Further, in reaching our holding today, we need not address whether the definite article "the" restricts or otherwise modifies the "purpose" that is the subject of treaty art. XII. *Cf. NLRB v. Noel Canning*, 573 U.S. \_\_\_\_, \_\_\_\_, 134 S. Ct. 2550, 2561 (2014) (discussing the meaning of "the" in the Constitution); *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342–1343 (Fed. Cir. 2008) (discussing the meaning and use of definite articles in patent law); *Colorado v. Sunoco, Inc.*, 337 F.3d 1233, 1241–1242 (10th Cir. 2003) (discussing the meaning and use of definite articles under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Pub. L. No. 96–510, 94 Stat. 2767 (codified as amended at 42 U.S.C. secs. 9601–9675 (2000))); *Ltd., Inc. v. Commissioner*, 286 F.3d 324, 333–334 (6th Cir. 2002) (addressing the word "the" as used in sec. 956(b)(2)(A)), *rev'g* 113 T.C. 169 (1999).

[14] Regulations implementing the Mutual Educational and Cultural Exchange Act of 1961, Pub. L. No. 87–256, 75 Stat. 527 (codified as amended

Continued

sible categories of participant eligibility on Form DS–2019, *see* 22 C.F.R. sec. 62.4(d) and (e) (2010); *supra* note 14, petitioner was not described as a teacher or a professor on the original Form DS–2019 or any subsequent renewal of the form.

The 2009 agreement outlines the university's and petitioner's responsibilities during the residency training program and frames petitioner's expectations of the residency training program. The university agreed to provide a "graduate medical education program" with "faculty oversight and

at 22 U.S.C. secs. 2451–2464 (1988)) govern the issuance of Form DS–2019 and define the categories of participant eligibility in an exchange visitor program underlying the issuance of a J–1 visa. *See* 22 C.F.R. secs. 62.1, 62.2, 62.4 (2010). Under the regulations, "alien physician" is a category of participant eligibility in which foreign medical school graduates may enter the United States to participate in either a clinical exchange program or a nonclinical exchange program. *Id.* sec. 62.27(b) and (c); *see id.* para. (d). A clinical exchange program is a program for alien physicians pursuing graduate medical education or training, and, inter alia, requires that an alien physician provide a statement from the Government of his home country that (1) there is a need in that country for qualified medical practitioners in the alien physician's chosen speciality and (2) the alien physician has in writing agreed to return to the home country upon completion of the training and intends to practice medicine in the chosen speciality. *Id.* para. (b)(6). A nonclinical exchange program is a program in which an alien physician enters the United States for the predominant purposes of observation, consultation, teaching, or research, wherein patient care, if any, is incidental and under direct supervision. *Id.* sec. 62.27(c). Although petitioner's Form DS–2019 does not specifically state whether he entered the United States for the purpose of a clinical or a nonclinical exchange program, the record indicates that petitioner intended to pursue a clinical exchange program. For example, only alien physicians entering a clinical exchange program need to pass steps 1 and 2 of the USMLE (or a similar examination). Petitioner testified that he needed to pass the USMLE to begin his residency training program. *See id.* para. (b)(5).

"Graduate medical education or training" is defined as "participation in a program in which the alien physician will receive graduate medical education or training, which generally consists of a residency or fellowship program involving health care services to patients, *but does not include programs involving observation, consultation, teaching or research in which there is no or only incidental patient care*." *Id.* sec. 62.2 (emphasis added).

The applicable definition of research scholar is: "An individual primarily conducting research, observing, or consulting in connection with a research project at research institutions, corporate research facilities, museums, libraries, post-secondary accredited educational institutions, or similar types of institutions. The research scholar may also teach or lecture, unless disallowed by the sponsor." *Id.* sec. 62.4(f).

supervision of all educational and clinical activities". Petitioner agreed to "fulfill the educational requirements of the training program" and use his "best efforts to provide safe, effective and compassionate patient care". In the context of the 2009 agreement, the "educational * * * activities" and "educational requirements" are most reasonably interpreted to refer to the education petitioner would receive by participating in the residency training program. The offer letter, which does not speak to petitioner's duties, and the 2009 agreement encompassed the entire understanding between the university and petitioner. [15] Neither document refers to any obligation to teach medical students nor suggests that petitioner's remuneration was for teaching. Rather, the 2009 agreement focuses on the education petitioner would be receiving and the patient care he would be providing as a resident. Moreover, the 2009 agreement was renewed for each year of petitioner's residency without a material change in the description of the residency training program or petitioner's responsibilities as a resident.

During the residency training program petitioner's training consisted of treating patients under faculty supervision, conducting and presenting research, and supervising and training medical students. Petitioner was responsible for taking three to five medical students with him on rounds, preparing them for their monthly examinations, and evaluating them at the end of each month. Although petitioner estimated that he spent 70% of his time in "education-related" activities, we do not find his estimate convincing because, as he acknowledged, much of his time spent with medical students occurred while he was also treating patients. Nor do we assign much weight to the Form 9210 and unsigned Form 9250 that petitioner completed in 2012, in which petitioner stated that his primary purpose in visiting the United States was "teaching/research/training in internal medicine" and estimated that he spent 50% of his time teaching and 50% of his time researching during taxable years 2010–12. Petitioner completed these forms two

---

[15] In the record is a letter dated November 20, 2012, from the university's director of the internal medicine residency training program describing petitioner's position and duties during his residency. Although helpful in ascertaining what petitioner did during his residency, the letter is not part of the offer or contract between petitioner and the university.

years after the year in issue, and we regard them only as petitioner's post hoc position regarding his 2010 claimed treaty exemption. Moreover, on the Form 9250 petitioner indicated that his occupation before coming to the United States was medical student and his occupation upon returning to Pakistan would be consultant physician in nephrology. This description of petitioner's occupation before and after the residency training program clearly implies that he participated in the residency training program to obtain a change in professional status.

Petitioner contends that his time spent "teaching" medical students is sufficient to prove that he was in the United States for the "purpose of teaching". However, petitioner's involvement in the supervising and training of medical students was a component of his stated goal to receive U.S. medical training and become a fully licensed doctor and was not his objective or aim during the year in issue. The overwhelming weight of the evidence shows that petitioner did not enter the residency training program to become a teacher. The university did not hire petitioner to teach, and he did not hold a faculty appointment. The Form DS–2019 and the 2009 agreement show that neither ECFMG nor the university contemplated that petitioner was coming to the United States with the "objective" or "goal" of teaching. *See* Black's Law Dictionary 1356. Instead, teaching was an incidental part of petitioner's overall training to become a doctor, which primarily involved treating patients and also included conducting research.[16] On the basis of all the facts and circumstances, we find that petitioner's purpose in coming to and remaining in the United States in 2010 was to receive postgraduate medical training and that he was not in the United States for the purpose of teaching.

Petitioner cites several revenue rulings to support his position that he was in the United States for the purpose of teaching. However, they do not help him.

---

[16] Some income tax treaties to which the United States is a party exempt from income tax any remuneration received for conducting research. *See, e.g.*, Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, U.S.-Belg., art. 19(2), Nov. 27, 2006, Tax Treaties (CCH) para. 31,011 (entered into force Dec. 28, 2007). The United States-Pakistan Income Tax Convention is not one of them.

Rev. Rul. 55–211, 1955–1 C.B. 676, concerns the application of a treaty provision similar to treaty art. XII to nationals of the United Kingdom who held faculty appointments at various universities in the United States. The revenue ruling concludes that the treaty benefit obtains if an individual's "primary purpose * * * is to teach, lecture or instruct" and "a substantial portion of his time is devoted to such duties". *Id.*, 1955–1 C.B. at 677. "Where, however, the primary purpose of his presence in the United States is the pursuit of research and like duties and any teaching is incidental to such research it cannot be considered that he is present in the United States 'for the purpose of teaching'". *Id.* The revenue ruling also states: "Activities in which a teacher engages for the purpose of conferring on students the benefit of his knowledge and methods as distinguished from the pursuit of his own projects would be considered a part of his teaching." *Id.*

Rev. Rul. 74–174, 1974–1 C.B. 371, interprets Rev. Rul. 55–211, *supra*, and applies its reasoning to different facts. [17] It involves a citizen and resident of Canada who was an assistant professor in Canada, entered the United States to study for a doctoral degree, and spent 60% of his time in the United States performing duties as a teaching assistant. Rev. Rul. 74–174, *supra*. Applying an objective facts and circumstances analysis, the revenue ruling concludes that the individual's compensation for his duties as a teaching assistant was exempt from income tax because he "was engaged in the business of teaching before coming to the United States" and because he spent substantial time performing teaching duties even though he was also a doctoral student. *Id.*, 1974–1 C.B. at 372.

Petitioner contends that "because the vast majority of his time was spent engaged in educational duties", he falls within the purview of Rev. Rul. 55–211, *supra*, and qualifies for an exemption under treaty art. XII. However, the evidence in the record supports findings that petitioner was a medical student, not a teacher, before coming to the United States for his residency training program, *see supra* note 3, and that he did not hold a faculty or teaching position at the

---

[17] Petitioner does not explicitly rely on Rev. Rul. 74–174, 1974–1 C.B. 371, but we address it for the sake of completeness.

university during 2010. Petitioner's supervising and training of medical students, which he performed mainly while treating patients, was incidental to his graduate medical education, and he has not "distinguished [supervising and training of medical students] from the pursuit of his own projects". *See* Rev. Rul. 55–211, 1955–1 C.B. at 677. Petitioner's situation is distinguishable from those in Rev. Rul. 55–211, *supra*, and Rev. Rul. 74–174, *supra*.

Petitioner also cites Rev. Rul. 69–46, 1969–1 C.B. 365, and Rev. Rul. 70–382, 1970–2 C.B. 331, for the proposition that an individual does not need to have taught in his home country before entering the United States for the purpose of teaching. The revenue rulings state that, as applied to treaty provisions similar to the one at issue here, an individual's remuneration for teaching is exempt from income tax even if the individual had not taught in his home country before entering the United States. Rev. Rul. 70–382, 1970–2 C.B. at 331; Rev. Rul. 69–46, 1969–1 C.B. at 365. However, in both revenue rulings the individuals qualified as teachers in their home countries and entered the United States for the express purpose of teaching in schools. Rev. Rul. 70–382, *supra*; Rev. Rul. 69–46, *supra*. The record overwhelmingly establishes that petitioner did not enter the United States for the express purpose of teaching. Rev. Rul. 69–46, *supra*, and Rev. Rul. 70–382, *supra*, do not support petitioner's contention.

Finally, petitioner cites *United States v. Mem'l Sloan-Kettering Cancer Ctr.*, 563 F.3d 19 (2d Cir. 2009), for the proposition that modern medical residents are principally teachers. The issue in *Sloan-Kettering* was whether medical residents were liable for payroll taxes because they were employees or whether their income was excepted from payroll taxes because they were students. *Id.* at 24–25. In remanding the two consolidated cases, the U.S. Court of Appeals for the Second Circuit held that "[w]hether a medical resident is a 'student' and whether he is employed by a 'school, college, or university' are separate factual inquiries that depend on the nature of the residency program in which the medical residents participate and the status of the employer." *Id.* at 28 (quoting *United States v. Mount Sinai Med. Ctr. of Fla., Inc.*, 486 F.3d 1248, 1252 (11th Cir. 2007)). Petitioner argues that, consistent with the Court of Appeals' reasoning, the record

proves that he was a teacher rather than a student because he was compensated and received benefits for his services.

*Sloan-Kettering* is not binding precedent in this case [18] and is inapplicable to services performed on or after April 1, 2005, the effective date of regulations that created a bright-line rule for distinguishing between students and full-time employees for purposes of the student exception to payroll taxes under section 3121(b)(10). *See Sloan-Kettering*, 563 F.3d at 25 n.2; sec. 31.3121(b)(10)–2(d)(3)(iii), (e) *Example (4)*, (f), Employment Tax Regs.; *see also Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44 (2011) (holding the regulations that apply to services performed on or after April 1, 2005, valid). Moreover, petitioner takes the analysis of *Sloan-Kettering* several inferential steps too far. *Sloan-Kettering* involved payroll taxes rather than a treaty provision and focused on whether medical residents are students or employees without specifying whether a medical resident who was an employee was compensated for treating patients, researching, teaching, or performing other personal services.

The guidance that petitioner cites is inapposite or distinguishable. The record clearly proves that petitioner's purpose in the United States during 2010 was to receive medical training. The supervising and teaching of medical students that petitioner did was an incidental part of his medical training and was not his objective or goal in coming to or remaining in the United States. We conclude that petitioner was not in the United States in 2010 for the purpose of teaching. [19]

---

[18] Under the rule of *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971), this Court will "follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone." This case appears to be appealable to the U.S. Court of Appeals for the Tenth Circuit, absent a stipulation to the contrary. *See* sec. 7482(b)(1)(A), (2). Therefore caselaw from the U.S. Court of Appeals for the Second Circuit would not be binding in this case even if *United States v. Mem'l Sloan-Kettering Cancer Ctr.*, 563 F.3d 19 (2d Cir. 2009), were "squarely in point", which it is not.

[19] Because we find that petitioner was not in the United States for the purpose of teaching, we do not address respondent's remaining contentions regarding the applicability of treaty art. XII.

B. *Article XIII(3) of the United States-Pakistan Income Tax Convention*

Petitioner's alternative contention is that, if his income is not exempt under treaty art. XII, then $10,000 of his income is exempt under treaty art. XIII(3). Article XIII(3) of the United States-Pakistan Income Tax Convention provides:

> A resident of one of the contracting States temporarily present in the other contracting State under arrangements with such other State or any agency or instrumentality thereof solely for the purpose of training, study or orientation shall be exempted from tax by such other State with respect to compensation not exceeding 10,000 United States dollars for the rendition of services directly related to such training, study or orientation (including emoluments and remuneration, if any, from the employer abroad of such resident).

As applicable here, "other State" means the United States. *See id.* art. II(1)(c). The Department of the Treasury technical explanation of the treaty clarifies that this exemption applies to "Pakistan personnel invited to the United States for training or study by our Government," including "military and armed forces trainees, central bank employees studying budgetary and financial policies, and trainees under technical assistance programs." Technical Explanation, *supra*.

In the petition, petitioner vaguely contends that he qualifies for this exemption because the university is a Government contractor and therefore is an agency or instrumentality of the United States. We have recognized that "'[a]gency' and 'instrumentality' are terms of considerable breadth, and they are susceptible of different meanings in different contexts." *Guardian Indus. Corp. v. Commissioner*, 143 T.C. 1, 12–14 (2014) (listing cases where "agency" and "instrumentality" have different definitions in various circumstances). However, even if petitioner had provided authority to support his contention that a Government contractor qualifies as an agency or instrumentality in this context, which he has not, he has failed to introduce any credible evidence showing that the university was a Government contractor for the U.S. Government in 2010. Moreover, there is no credible evidence to prove that the signatories of the treaty intended article XIII(3) to apply to anything other than a Government-sponsored or -supported program. *See* Technical Explanation, *supra*; *cf.* Rev. Rul. 72–301, 1972–1

C.B. 439–440 (analyzing similar provisions in other income tax treaties to conclude that treaty art. XIII(3) applies only to "individuals who, under arrangements with the United States or an agency or instrumentality thereof, are invited to the United States for training or study under a specific program, sponsored or supported by the United States Government"). Because petitioner bears the burden of proof with respect to this issue, *see supra* p. 359, and has not proven that he was in the United States under arrangements with the U.S. Government or an agency or instrumentality thereof, he is not entitled to an exemption under treaty art. XIII(3).

IV. *Conclusion*

Petitioner does not qualify for an exemption under article XII or article XIII(3) the United States-Pakistan Income Tax Convention. We therefore sustain respondent's determination as amended in the first supplemental stipulation of facts. *See supra* note 1. We have considered the parties' remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155*.